UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RR AND WR, INDIVIDUALLY AND AS NEXT FRIENDS OF MR, | : | |
| | : | |
| *Plaintiffs*, | : | No. 3:21cv00873 (JCH) |
| v. | : | |
| | : | |
| GREENWICH BOARD OF EDUCATION, | : | |
| | : | |
| *Defendant.* | : | AUGUST 8, 2022 |


**MEMORANDUM OF LAW IN SUPPORRT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Patrick M. Fahey (ct13862)
Andreana R. Bellach (ct21302)
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 16013
Tel.: (860) 251-5000
Fax: (860) 251-5219
pfahey@goodwin.com
abellach@goodwin.com

Abby R. Wadler (ct28051)
Town Hall, Law Department
101 Field Point Road, P.O. Box 2540
Greenwich, CT 06836-2540
Tel.: (203) 622-7876
Fax.: (203) 622-3816
abby.wadler@greenwichct.org

*Attorneys for Defendant
Greenwich  Board of Education*

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   STATUTORY FRAMEWORK ..................................................................... 1

III.  STATEMENT OF FACTS ............................................................................ 3

    A. The Expired New York IEP. ..................................................................... 4

    B. The Move to Greenwich and Start of Classes. ......................................... 6

    C. Start of Classes at CMS. ........................................................................... 7

    D. Development of the Greenwich IEP. ........................................................ 8

    E. The Student Renews Her Winston Prep Application and CMS
       Addresses her Attendance. ...................................................................... 10

    F. The Unilateral Placement at Winston Prep. ........................................... 12

    G. CMS Continues to Offer Services and to Conduct PPTs. ....................... 14

    H. The Due Process Challenges. .................................................................. 15

IV.   ARGUMENT ............................................................................................. 16

    A. Standard of Review of Administrative Decisions Under the IDEA. ....... 16

    B. The Burlington/Carter Standard. ............................................................ 18

    C. The Board Complied with the IDEA. ..................................................... 19

      1.  The Board complied with the procedural requirements of the
          IDEA. .............................................................................................. 19

         a.    The NYC IEP is not binding on a Connecticut school
             district. ................................................................................... 20

         b.    The Board's evaluation and development of an IEP was
             timely. .................................................................................... 21

         c.    The Board met any obligation to the Student by
             implementing the NYC IEP. .................................................. 22

         d.    Even if there was a procedural violation, the Record does not
             support the denial of a FAPE. ............................................... 24

      2.  The Board Complied with the substantive requirements of the
          IDEA by providing an IEP reasonably calculated to provide a
          meaningful benefit. ......................................................................... 25

         a.    The IEP for the 2019-2020 academic year provided a FAPE. ... 26

         b.    The IEP for the 2020-2021 academic year provided a FAPE. ... 34

    D. The Plaintiffs Are Not Entitled to Tuition Reimbursement. ................... 36

V.    CONCLUSION ........................................................................................... 40

## I.      INTRODUCTION

This civil action is an appeal of the determination of an Independent Hearing Officer ("IHO") appointed by the Connecticut Department of Education pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. The case arises from the efforts of the Greenwich Board of Education (the "Board") to fulfill its responsibility to Student M.R. (the "Student"), a thirteen-year-old, rising eighth-grade student who moved from New York City to Greenwich in 2019 and the Parents' attempt to recover the costs for their unilateral decision to place her in a private school for the 2019-2020 and 2020-2021 academic years.

## II.     STATUTORY FRAMEWORK

The IDEA provides federal funds to aid the states in ensuring "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d). To receive such funding, states must enact policies and procedures designed to assure all children with disabilities the right to a "free appropriate public education." 20 U.S.C. § 1412(a)(1).[1] The IDEA defines "free appropriate public education" (commonly referred to as a "FAPE") as "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" and which is "formulated in accordance with the requirements of the Act." *Board of Educ. v. Rowley*, 458 U.S. 176, 203-04 (1982). The hallmark of the IDEA is its emphasis on the individualized nature of educational programming, which is set forth in an individual education program ("IEP"). *Burlington Sch. Committee v. Dep't of*

---

[1] Connecticut's statutory scheme implementing the IDEA is at Conn. Gen. Stat. §§ 10-76a *et seq*.

*Educ.*, 471 U.5. 359, 368 (1985); *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017); *Rowley*, 458 U.5. at 181-82. "It is through the IEP that the free appropriate public education required by the Act is tailored to the unique needs of a particular child." *Endrew F.*, 137 S. Ct. at 1000 (internal citations omitted). The IEP is a brief but comprehensive statement of the unique educational needs of the disabled child and special education and related services designed to meet these needs. *See id*. It is developed by a multidisciplinary team, including school officials and the parents of the student with a disability. In Connecticut the team is called the Planning and Placement Team ("PPT").

In enacting the IDEA, Congress did not intend to guarantee a specific educational outcome. Rather, the purpose of the IDEA is to provide students with disabilities with a base level of educational opportunity. *See Rowley*, 458 U.S. at 192. Thus, school districts are not charged with maximizing a child's potential. *See id*. at 198. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. A court's review of whether a school has fulfilled its obligation turns on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018) (quoting *Endrew F.*, 137 S. Ct. at 999).The IDEA further requires that recipients of federal funding for special education assure that:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This requirement is frequently referred to as the "least restrictive

environment," or LRE, requirement of the IDEA, and it codifies the goal for students with disabilities to be educated alongside non-disabled peers as much as possible.

In the event the parties fail to reach consensus regarding the issue of what constitutes a FAPE or are otherwise not satisfied with an IEP, the aggrieved party may engage in dispute resolution procedures set forth in federal and state law. *See* 20 U.S.C. § 1415; Conn. Gen. Stat. § 10-76h. The IDEA also provides a right to a "due process hearing" before an impartial hearing officer. 20 U.S.C. § 1415(f); Conn. Gen. Stat. § 10-76h(a). The provision for a due process hearing is a central procedural protection in the IDEA, but Congress left to the states the determination of the specifics of the hearing process. *See* 20 U.S.C. § 1415(b).

In Connecticut, hearing officers have extensive authority to review (1) the identification, (2) the evaluation, (3) the educational placement, and (4) the provision of a FAPE to any child requiring special education. Conn. Gen. Stat. § 10-76h(d)(1). The IHO is also empowered to hear testimony from both parties and to review any records necessary to determining the appropriateness of the student's program. *See* Conn. Gen. Stat. § 10-76h(c)(3). Any party aggrieved by the decision of the IHO may appeal the decision to state or federal court. 20 U.S.C. § 1415(i)(2).

## III.   STATEMENT OF FACTS

The Student's family moved from New York City to Greenwich, Connecticut, on August 27, 2019. (2/24 Test. of Mrs. R, at 104, ECF 25-8 at 1224). The Student was then thirteen-years old and entering eighth grade, and she had an IEP that had been developed by the New York City Department of Education (NYCDOE) for the prior academic year (i.e. 2018-19), which recommended placement in a public school in general education classes with special education supports. (*See* Board Ex. 11, ECF 25-6 at 20, 32).

A.  **The Expired New York IEP.**

The Student attended public school in New York through fourth grade, when concerns

were raised regarding her lack of attention and difficulty with executive function. (IHO Decision,

ECF 1-1 at ¶¶ 1-2). A neuropsychologist, Dr. Michelle Kornblueth, diagnosed Student with

having Attention Deficit/Hyperactivity Disorder and Specific Learning Disability with

Impairment in Mathematics. (*Id*. at ¶¶ 3, 5; Pls. Ex. 1, ECF 25-2 at 36-50). Student received

accommodations under Section 504 of the Rehabilitation Act of 1973 including extended time

for assignments and use of a separate location for test taking. (IHO Decision, ECF 1-1, at ¶ 6). In

December 2016, Student had an IEP developed by the NYCDOE recommending counseling, and

special education teacher support for English language arts ("ELA") and math. (*Id*. at ¶ 7).

Student was enrolled in private schools at York Preparatory School ("York") and Fusion

Academy for sixth (2017-2018) and seventh grade (2018-2019), respectively. (*Id*. at ¶ 8).

Student was evaluated in 2018 by Dr. Preetika Mukherjee, who recommended that the

Student be classified for special education services under the category of Other Health

Impairment ("OHI"). (*Id*. at ¶ 10; Board Ex. 12, ECF 25-6 at 45). NYCDOE prepared a revised

IEP in August 2018 considering Dr. Mukherjee's evaluation and Parents' concerns such as their

belief that student required small class sizes ("NYC IEP"). (*Id*. at ¶ 11; Board Ex. 11, ECF 25-6

at  20-35). The NYC IEP, which again was developed at the end of sixth grade for the start of the

seventh grade school year, reflected the Student's academic skills to be at or near grade level,

with the Student's instructional reading skills at the sixth-grade level and the Student's math

skills at the fifth-grade level. (*See* NYC IEP, ECF 25-6 at 33). Taking that information into

account, the skills addressed through the NYC IEP included inferential and higher order reading

comprehension (identifying character traits, themes, character changes, improving inferential

reading, and improving reading stamina), writing (planning writing essays), math (solving multi-

4

step word problems and solving multiplication and division problems through algorithms), social skills, coping skills, and self-confidence. (*Id*. at 25-7).

The NYC IEP provided that all classes for core academic subjects should be located in general education classrooms with special education supports integrated therein, together with push-in and pull-out special education supports and counseling sessions, one individual and one group session for forty minutes each per week. (*Id.* at 29). Although the Student was attending a private school at the time of the development of this IEP, the NYC IEP did not recommend placement in a specialized private school. (*Id*. at 32).

Despite there being no mention of one-on-one support in the NYC IEP, the Student's mother ("Mrs. R") testified that Parents felt the Student needed one-to-one academics, so Parents placed her at Fusion Academy – also a private school – for the 2018-2019 school year. (*See* 2/24 Test. of Mrs. R at 111-13, ECF 25-8 at 1231-33). The Parents never challenged either of the IEPs created by the NYCDOE by means of a due process request. (*See* IHO Decision, ECF 1-1 at ¶ 12; *see* 2/24 Test. of Mrs. R, ECF 25-8 at 1312-12).

In November 2018, Parents had considered moving Student from Fusion Academy to Winston Preparatory School's New York campus ("New York Winston Prep") for the following school year, i.e. the 2019 – 2020 school year. (2/14 Test. of Mrs. R, at 97, ECF 25-8 at 1217). To that end, Parents attended an open house at New York Winston Prep on November 13, 2018 (*id.* at 1218), and Student attended an interview and shadow day thereafter. (*Id*. at 1221). Student applied to New York Winston Prep, providing a neuropsychological evaluation from Dr. Mukherjee and another from Michelle Kornblueth, and Student's NYC IEP. (*Id*. at 1220-21). By February 2019, Parents paid a deposit to, and Student was accepted by, New York Winston Prep.

(*Id*. at 1219, 1221). In June 2019, Parents declined acceptance to New York Winston Prep, and decided to move from Manhattan to Greenwich, Connecticut. (*Id*. at 1221-22).

**B. The Move to Greenwich and Start of Classes.**

Mrs. R. testified that in June 2019, Parents looked to move to Greenwich in a location that would be served by Greenwich's Central Middle School ("CMS"). (*Id*. at 1223-24). Towards the end of June, Parents and Student went to CMS to pick up enrollment forms. (*Id*. at 1222). Student attended a two-week summer camp in New York, while the family remained living in Manhattan. (*Id*. at 1224-25, 1227). Although she was otherwise available through the summer for tours of schools, Parents and Student did not again visit CMS until mid-August. (*Id*. at 1227-28).

At some point in mid-August, Mrs. R met with CMS Guidance Counselor Michele Davis to return registration material for the 2019-2020 school year. (*Id*. at 1228-30). Mrs. R provided the school with Student's NYC IEP and only one of her neuropsychological evaluations – the evaluation prepared by Dr. Mukherjee. (*Id*. at 1228-30). Mrs. R did not provide CMS with the evaluation prepared by Dr. Kornbleuth, even though that evaluation addressed some of Student's learning disabilities. (*Id*. at 1024). At this meeting, Mrs. R told Ms. Davis that the Student was very sensitive with high levels of anxiety, so the parties discussed ways to make the transition to CMS easier for Student. (2/19 Test. of Mrs. R at 54, ECF 25-8 at 1012). Ms. Davis informed Mrs. R that there would be someone at the school to guide Student on her first day of classes. (*Id*.). Before the first day of classes, Ms. Davis and the Administrator for Special Education Lindsey Pontieri, along with special educators and administrators at CMS collaborated to develop Student's initial class schedule. (1/19 Davis Test., ECF 25-8 at 730, 735). CMS relied on all the Student's past information provided to CMS, including the NYC IEP, the 2018 evaluation and Parent's considerations in creating the Student's initial schedule. (*Id*. at 735; *see also* 12/10 Davis Test., ECF 25-8 at 730-31).

Although the Student's NYC IEP required an annual review (at which NYCDOE would develop an IEP for 2019-20 school year) to be held no later than August 7, 2019 – and even though Student remained a resident of New York as of August 7, 2019 – Greenwich received only the expired IEP. Regardless, the CMS staff developed an initial schedule of classes and supports for the student. CMS Administrator, Thomas Healy, testified that Student was initially enrolled in a mix of grade level general education classes and skills-based, special education classes for English, math and academic lab.[2] (12/10 Test. of Mr. Healy, ECF 25-8 at 488).

### C. Start of Classes at CMS.

The Student's family moved to Greenwich on August 27, mere days before the start of classes at CMS on August 29. (2/24 Test. of Mrs. R at 104, ECF 25-8 at 1224; Academic Calendar, Pls.' Ex. 28, ECF 25-4 at 44). On August 29, CMS notified and confirmed Parents' ability to attend a PPT meeting on September 9 and provided the required five-day advanced notice for that meeting. (*See* 2/24 Test. of Mrs. R at 115, ECF 25-8 at 1235; *see also* Notice, attached to Board Ex. 9, ECF 25-6 at 17).

During the first week of classes, Special Education teacher and case manager, Judie Baumeister, along with another special educator taught Student's ELA skills class. (11/9 Baumeister Test., ECF 25-8 at 34-35). However, based on Student's work product and abilities, both educators agreed that the general education ELA class, with less than twenty students and with the support of Ms. Baumeister and a paraprofessional, was the least restrictive environment for Student. (*Id*. at 34-55; 10/8 Baumeister Test., ECF 38 at 245, 281). In consultation with her CMS team and Mrs. R, Student was moved to a general English class with support from a paraprofessional and Ms. Baumeister. (*Id.* at 36, 37-39; 10/8 Test. at 45, ECF 38 at 281; 11/17

---

[2] The NYC IEP reported the Student's final academic average to be 70%, with grades of 74 in Earth Science, 73 in Geography, 69 in English, 68 in World Languages and F in Math. (*See* NYC IEP, Board Ex.11, ECF 25-6 at 21).

Davis Test., ECF 25-8 at 735). Ms. Baumeister testified that she recalled Student being happy when hearing about the change. (11/9 Test. of Ms. Baumeister, ECF 25-8 at 37).

**D.  Development of the Greenwich IEP.**

The purpose of the September 9 meeting was to review the NYC IEP and create a Greenwich IEP. (2/24 Test. of Mrs. R at 195, ECF 25-8 at 1315). At the meeting, Mrs. R reviewed the proposed IEP. (*Id*. at 1240-41). The IEP noted that the Student had been determined to be eligible under Connecticut law as a student with a disability under exceptionality category of OHI-ADD/ADHD and that she required specialized instruction in the areas of math, social, emotional and behavioral functioning. (Board Ex. 9, ECF 25-6 at 1-2). The NYC IEP had recommended all general education academic classes with special education supports integrated into the setting. (Board Ex. 11, ECF 25-6 at 29). The Greenwich IEP recommended Academic Lab 5 times for 46 minutes per week and special education math skills class 5 times for 46 minutes per week. (Board Ex. 9, ECF 25-6 at 15). Additionally, the Student had the support of Ms. Baumeister and a paraprofessional in her English class. (10/8 Baumeister Test., ECF 38 at 281). Similar to the NYC IEP, which had recommended counseling support to be delivered in a separate setting outside of the general education classroom, to address the development of coping skills and self-confidence (Board Ex. 11, ECF 25-6 at 29), the Greenwich IEP recommended counseling one time 20-minutes individual and one time 30-minute group per week. (Board Ex. 9, ECF 25-6 at 6). Mrs. R testified that she agreed with the goals of the IEP and with implementing it immediately. (2/24 Test. of Mrs. R at 120, ECF 25-8 at 1240). In agreeing with the goals of the IEP, Mrs. R admitted that the September IEP was consistent "on paper" with Student's NYC IEP. (*Id*. at 1022). Mrs. R. testified that during Student's first few weeks at CMS, she and team members communicated very often (*id.* at 1234) and that Student was doing "okay" and having very minimal anxiety (*id.* at 1271).

8

Following the September 9 PPT meeting, CMS staff reconvened on multiple occasions per week to discuss Student's accommodations and progress. (IHO Decision, ECF 1-1 at 7 ¶ 39; *see* 9/16 J. Outhouse Test., ECF 38 at 86). On September 12, CMS administered math and reading assessments, Star Reading and Star Math, on which she scored in the above-average range in reading. (11/9 Baumeister Test., ECF 25-8 at 41-2; *see* ECF 25-8 at 41-42). This performance was consistent with Ms. Baumeister's observations of Student's abilities in the English skills class and supported general education English class. (11/9 Baumeister Test., ECF 25-8 at 42). However, Ms. Baumeister testified that attendance and related lack of work completion became an issue. (*Id*. at 47-53, 70-71). CMS teacher Jesse Outhouse, who taught Student's second period science class tried to motivate Student, but observed that her chronic tardiness and incomplete assignments affected her ability to learn and cooperate with his teaching strategies. (*See* IHO Decision, ECF 1-1 at ¶¶ 58, 60; 9/16 Outhouse Test., ECF 38 at 73-74, 76, 117-18).

School Psychologist, Catherine Napoletano, was responsible for implementing the social-emotional and social-behavioral goals with Student. (12/10 Napoletano Test., ECF 25-8 at 417-18). To Ms. Napoletano's recollection, Student never approached her upset about any situation in school. (*Id*. at 423). She did, however, testify that Student missed over half of her counseling sessions because of absences or tardiness (*id.* at 423; 11/17 Test., ECF 25-8 at 225-26), as Student only attended thirteen full days between the start of school and October 4, 2022. (*See* IHO Decision, ECF 1-1 at 12; 12/10 Napoletano Test., ECF 25-8 at 423; 11/17 Test., ECF 25-8 at 225-26; *see also* Attendance History, Board Ex. 1, ECF 25-5 at 8-9).[3]

---

[3] There were only 39 school days between the first day of classes on August 29 and the first day the Student was enrolled at Winston Prep. (*See* Pls.' Ex. 28, EC 25-4 at 44). There were only 22 total school days between August 29 and October 2, 2019 (the date the Parents sought immediate placement at Winston Prep). There were a total of 180 school days in the 2019-2020 school year. (*Id.*).

**E. The Student Renews Her Winston Prep Application and CMS Addresses her Attendance.**

CMS was not made aware of school avoidance issues by the NYC IEP or during the September 9 PPT meeting. (11/9 Test. of Baumeister at 39, ECF 25-8 at 45). And, while the 2018 evaluation provided by Dr. Mukherjee noted that the student experienced some school avoidance, he reported that this stemmed from specific peer bullying at a prior private school. (*See* Board Ex. 12, ECF 25-6 at 38, 45). The NYC IEP, which considered the report from Dr. Mukherjee, did not note any concerns of school avoidance or school refusal, nor did it recommend any strategies or specialized supports to address the Student's morning routine and tardiness. Indeed, the NYC IEP noted that there was no need for a behavior intervention plan. (Board Ex. 11, ECF 25-6 at 24). Rather, the NYC IEP attributed the Student's tardiness to school to her "difficulty with transitions and completing the morning routine in a timely fashion." (Board Ex. 11 at 4, ECF 25-6 at 23). To adapt to and address this issue, in mid-September, CMS devised a school refusal plan (also referred to as a "school avoidance plan"). (11/9 Baumeister Test., ECF 25-8 at 60-61; 11/17 Napoletano Test., ECF 25-8 at 229; 1/19 Davis Test. ECF 25-8 at 736-37; *see also* Board Ex. 7, ECF 25-5 at 83).

Student's counseling sessions with Ms. Napoletano were scheduled for the morning as a way to proactively ease Student into her day. (11/17 Napoletano Test., ECF 25-8 at 228). If Student missed a session, Ms. Napoletano would offer her time when she arrived. (*Id.*). After three absences and on her sixth tardy day, Student came to CMS late because she was touring another school, Winston Preparatory School in Norwalk ("Norwalk Winston Prep"). (*Id.* at 234-5*; see also* Attendance Record, Board Ex. 1, ECF 25-5 at 8-10). Indeed, the Student made a comment to Ms. Napoletano that her tardiness "didn't really didn't matter anyway." (12/10 Napoletano Test., ECF 25-8 at 421-22).

Ms. Napoletano contacted Parents to discuss CMS's school avoidance plan (12/10 Napoletano Test., ECF 25-8 at 457-58), which included a plan for nighttime and morning routines for Parents to implement at home. (11/17 Napoletano Test., ECF 25-8 at 230-32; *see also* Board Ex. 7, ECF 25-5 at 83 (plan)). CMS provided Mrs. R with a copy of the plan on September 26, 2019 and invited feedback. (11/17 Napoletano Test., ECF 25-8 at 235). Despite these efforts, the issue remained and, on October 2, Student was absent from CMS so she could spend a shadow day at the Norwalk campus of Norwalk Prep. (11/9 Baumeister Test., ECF 25-8 at 44; 2/24 Test. of Mrs. R, ECF 25-8 at 1153).

On October 4, the PPT convened to review and revise the Greenwich IEP, at which time the school avoidance plan was discussed and adopted by the PPT. (*See* Board Ex. 7, ECF 25-5 at 66-86). Ms. Napolitano explained that she was working to build a relationship with the Student. (*Id.* at 67). She asked to collaborate with the family on strategies that they have observed that work at home, and added to the coping skills IEP goal and new IEP goal to address school attendance. (*Id.* at 67, 75-77; 12/10 Healy Test., ECF 25-8 at 520-21; 11/17 Napoletano Test., ECF 25-8 at 252). As an added support, the PPT included Tara Jogee, Teen Talk Counselor, who provided information to the Parents about additional supports available from community-based resources to support families and students. (*See* Board Ex. 7, ECF 25-5 at 66-67; 11/9 Baumeister Test., ECF 225-8 at 67). The team further revised the goals and objectives of the IEP to expressly address attendance and academic performance. ((*See* Board Ex. 7, ECF 25-5 at 75-77).

The plan called for, among other things, that if the Student is experiencing school avoidance/refusal, the parent will contact CMS to access support resources. CMS staff will then call home and speak to the Student, providing specific expectations for Student, and if those

interventions are not successful, parent would contact 2-1-1 (clinical support services available to CT families) and school staff would make a home visit if there were any prolonged periods of school refusal/avoidance. (Board Ex. 7, ECF 25-5 at 83-84). The IEP summary reflects that Parent shared that they had not yet engaged an outside therapist to support student as they were "in the process" of finding an outside therapist. (Board Ex. 7, ECF 25-5 67). Again, however, Parents did not make any requests that were refused by the school team (*id*, at 69) and Parent and Student signed the plan on 10/4/19.(Board Ex. 7, ECF 25-5 at 83).

## F.  The Unilateral Placement at Winston Prep.

By the time of the October 4 PPT, however, Student had already been accepted to Winston Prep's Norwalk campus. (IHO Decision, ECF 1-1 at ¶ 73; Acceptance Letter, Pls.' Ex. 30, ECF 25-4 at 61). Indeed, the Student had told Ms. Baumeister that she would be leaving CMS. (11/9 Baumeister Test., ECF 25-8 at 52). On October 11, Parents gave formal notice to CMS that they were placing the Student at Winston Prep. (Pls.' Ex. 6, ECF 25-2 at 96-97). Specifically, Plaintiffs' attorney sent a letter advising CMS that Parents intended to make placement at Norwalk Winston Prep and to seek public funding of that unilateral placement. (*Id.*).

CMS staff continued to attempt to engage Student. Ms. Napoletano attempted to schedule a home visit on October 16, but Parents told staff not to come. (12/10 Napoletano Test., ECF 25-8 at 427). Of the 39 full school days between August 29 and October 31, Student fully attended CMS less than half of those days. (IHO Decision, ECF 1-1 at 8, 12; Attendance Record, Board Ex. 1, ECF 25-5 at 8-10; Academic Calendar, Pls.' Ex. 28, ECF 25-4 at 44).

Prior to Student beginning at Norwalk Winston Prep, clinical psychologist Dr. Riordan evaluated Student. (*See* 10/8 Yanotti Test., ECF 38 at 408). Student's previous evaluations were neuropsychological evaluations, completed by neuropsychologists. (*See* Pls.' Ex. 1, ECF 25-2 at

36-50; Board Ex. 12, ECF 25-6 at 545). Dr. Riordan is not a neuropsychologist. (11/17 Riordan

Test., ECF 25-8 at 275). Dr. Riordan did not have any communications with any members of

CMS (11/17 Riordan Test., ECF 25-8 at 277), but her colleague observed Student during classes

at CMS on October 17. (*Id*. at 281). The following morning Student did not report to school

(IHO Decision, ECF 1-1 at ¶¶ 124-26; Board Ex. 1, ECF 25-5 at 8). Ms. Napoletano offered a

home visit, but again was declined by Parents. (12/10 Napoletano Test., ECF 25-8 at 427). Dr.

Riordan continued evaluating Student over the course of three more days (11/17 Riordan Test.,

ECF 25-8 at 278), but did not recall reviewing any records from CMS. (*Id*. at 280). Based on the

assessments administered by Dr. Riordan, the Student has strength in her vocabulary, is an avid

reader, showed great skill in writing prose, and scored above average on vocabulary

comprehension, average for fluid reasoning, and oral reading, and below average in certain areas

of math computation and math problem solving. (*See* ECF 25-5 at 106-111). She did not opine as

to whether Student should be identified under OHI, ADHD, or another specific learning

disability (11/17 Riordan Test., ECF 25-8 at 310), but did ultimately provided a series of

recommendations based on the assessment. (*Id*. at 310-11; *see also* ECF 25-5 at 101-04). Dr.

Riordan's recommendations included instruction in inferential and higher level reading

comprehension, math, executive functions and social pragmatics. (*Id*.) Psychotherapy outside of

school was also recommended to address the Student's anxiety and self-esteem. (*Id*. at 311; ECF

25-5 at 104).

Student's first day at Winston Prep was October 29, 2019. (IHO Decision, ECF 1-1 at

¶120). Mr. Yanotti who testified for Parents is employed at Norwalk Winston Prep as a

counselor, Dean of Students, and Director of Summer Enrichment, but is an uncertified and

unlicensed school counselor (10/8 Yanotti Test., ECF 38 at 368). He testified that Norwalk

13

Winston Prep is not an approved special education school by the State of Connecticut. (*Id.* at 407). He testified that Norwalk Winston Prep does not have instruction provided by certified or licensed teachers (*id.* at 368), nor does Norwalk Winston Prep implement IEPs. (*Id.* at 409). Mr. Yanotti also testified that he did not participate in any PPT meetings at which the Student's educational program was developed or revised. (*Id.*). As such, while Winston was aware of Student's school avoidance issues, it did not establish a particular plan in response. (*Id.* at 383).

### G. CMS Continues to Offer Services and to Conduct PPTs.

All the while, CMS continued to offer appropriate services for Student. It convened a PPT on November 1 (Board Ex. 3, ECF 25-5 at 42-62) and another on January 14, 2020, (Board Ex. 2, ECF 25-5 at 11-41) at which time the PPT reviewed Dr. Riordan's evaluation report. (11/17 Riordan Test., ECF 25-8 at 313-14).[4] Based on discussion and information reviewed at the meeting, the PPT proposed adding direct instructional support, through special education, in areas of reading comprehension and social skills. (ECF 25-5 at 12, 35). The PPT also recommended conducting a functional behavior assessment in the areas of classwork initiation and classwork completion based upon, among other things, the report from Norwalk Winston Prep that the student continues not to initiate or complete classwork. (ECF 25-5 at 12; 12/10 Napoletano Test., ECF 25-8 at 432). A request was made by the Parents' counsel for the Board to fund the placement at Winston Prep, which was denied on the basis that the Board's IEP offered an appropriate program. (ECF 25-5 at 12)

The PPT convened again on July 21, 2020 to discuss the Student's services and goals for the 2020-2021 school year, which year involved transitioning to high school. (*See* Board Ex. 15,

---

[4] Curiously, Dr. Riordan who observed Student at CMS in connection with a report whose purpose was to help the student gain admission to Norwalk Winston Prep, did not report observing the Student at Norwalk Winston Prep to determine whether the program at was appropriate for Student. Instead she relied on the anecdotal reports of Norwalk Winston Prep and Parents. (*See* Board Ex. 8, ECF 25-5 at 87-104).

ECF 26-6 at 76-102; 2/24 Test. of Mrs. R. at 206-07, ECF 25-8 at 1326-27). Mrs. R attended the meeting and shared her concerns about the class sizes, size of the school, and schedules at Greenwich High School. (*Id.* at 1327-28). The Parents received prior written notice that their request for payment for Winston Prep again was refused by the PPT. (Board Ex. 15, ECF 25-6 at 79).

The PPT convened again in August to conduct an annual review. (*See* Board Ex. 17, ECF 25-7 at 1-36). The team, including the Parents, participated in discussion regarding triennial planning. (*Id.* at 1-2, 29-31). The school team recommended conducting updated academic, social and emotion assessments for the reevaluation of the student. (*Id.* at 36). The parents were provided with a consent to conduct the reevaluation, which the Board recommended completing by September 5, 2021. (*See id.* at 1, 36). Although Mrs. R later testified that she was not in agreement with the actions taken at the PPT meeting (2/24 Test. of Mrs. R at 209-210, ECF 25-8 at 1329-30), she did not ask for changes to Student's IEP in the August 2020 PPT meeting. (*Id.* at 211, ECF 25-8 at 1331). The Parents again requested that the Board fund the unilateral placement, and that request was again denied because the Board was offering her an appropriate program and placement. (*See* Board Ex. 17 ECF 25-7 at 2).

## H.  The Due Process Challenges.

On February 20, 2020, the Parents requested a due process hearing to address their claim that the Board had denied the Student a FAPE for the 2019-2020 academic year. Two additional due process requests were made, and those matters were consolidated by the Connecticut Department of Education into a single proceeding that began in September 2020. The hearing lasted nine days, spanned from September 2020 to February 2021 and comprised the testimony

of eleven witnesses, including school faculty, staff, administrators, a clinical psychologist and Mrs. R.[5]

After hearing the extensive testimony, the IHO held in favor of the Board in a comprehensive memorandum that includes over two hundred factual findings. The IHO concluded that the Board identified the Student as eligible for special education and timely made available to the Student a comprehensive program and placement at CMS that provided the Student with a FAPE for the 2019-2020 and 2020-2021 school years, and that the Parents effectively thwarted the Board's ability implement that program. The IHO thus denied the Parents' due process challenge and their demand for tuition reimbursement for their unilateral placement of the Student. The Parents now seek reversal of the IHO's Final Decision and Order.

## IV.   ARGUMENT

### A.  Standard of Review of Administrative Decisions Under the IDEA.

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When reviewing administrative determinations under the IDEA, "[c]ourts do not use the usual summary judgment standard." *Plainville Bd. of Educ. v. R.N. ex rel. H*., No. 3:09-CV-241 RNC, 2012 WL 1094640, at *6 (D. Conn. Mar. 31, 2012). In these cases, "[t]he court does not attempt to determine whether there are disputed issues of material fact, but rather bases its decision on the preponderance of evidence in the record." *P.S. v. Brookfield Bd. of Educ.*, 353 F. Supp. 2d

---

[5] Witnesses included staff, faculty and administrators of Central Middle School including Science teacher Jesse Outhouse, Special Education teacher Judie Baumeister, School Psychologist Catherine Napolitano, Principal Thomas Healy, School Counselor Michele Davis; staff and administrators of Greenwich High School including Cantor House, Administrator Christina Shaw, School Psychologist Ashley Holzel, School Counselor Suzanne Patti; as well as Jordan Yanotti, Clinical Psychologist Dr. Riordan, and Student's Mother. (*See* IHO Decision, ECF 1-1, at 2).

306, 310 (D. Conn. 2005), *aff'd*, 186 F. App'x 79 (2d Cir. 2006). Pursuant to the IDEA, a reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i).

In *Rowley*, the Supreme Court specifically sought to define "the role of state and federal courts in exercising the review granted by 20 U.S.C. § 1415." 458 U.S. at 186. The Court noted that Congress had incorporated elaborate procedural safeguards into the IDEA aimed at guaranteeing parental participation in the development of a student's special education program. Because of the Act's heavy emphasis on procedural protections for parents, the Court concluded that "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Id*. at 206.

Accordingly, the Court held that "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... The fact that § 1415(e) [now, § 1415(i)(2)] requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that *due weight* shall be given to these proceedings." *Id*. (emphasis added). In *Karl v. Bd. of Educ.,* 736 F.2d 873 (2d Cir. 1984), the Second Circuit held that "*Rowley* requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer." *Id*. at 877.

17

As this Court has held, an IHO's "conclusions about the educational appropriateness of an IEP are entitled to substantial deference in view of his or her 'special expertise in making judgments concerning student progress. [An] IHO's findings in this area may not be overturned 'absent objective evidence in the record suggesting that the [IHO] has reached an erroneous conclusion." *R.N.,* 2012 WL 1094640, at *8 (quoting *Cerra v. Pauling Cent. Sch. Dist.*, 427 F.3d 186, 195-69 (2d Cir. 2005)); *see also M.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96, 102, 104 (2d Cir. 2000) ("While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.") (internal quotation marks omitted); *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989) (deference is owed to decision of administrative hearing officer).

### B. The Burlington/Carter Standard.

Because the Plaintiffs unilaterally placed the Student at a private school, their claim must be analyzed under the "*Burlington-Carter*" standard, which refers to the Supreme Court's decisions in *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985) and *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993). *See Frank G. v. Board of Ed.*, 459 F.3d 356, 363-64 (2006). As a threshold matter, under the IDEA, a parent who unilaterally places her child at a private school without the consent of school officials does so "'at [her] own financial risk.'" *Carter,* 510 U.S. at 15 (quoting *Burlington,* 471 U.S. at 373–74). While a parent is eligible for reimbursement "if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate," 34 C.F.R. § 300.148(c); *see also Carter,* 510 U.S. at 15 (parent may only receive tuition reimbursement "if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act"),

18

courts and hearing officers have "'broad discretion'" in deciding whether such reimbursement is warranted. *Carter,* 510 U.S. at 16 (quoting *Burlington,* 471 U.S. at 369). Indeed, even if the Court concludes that a child was denied a FAPE, the cost of reimbursement may be reduced or denied "[u]pon a judicial finding of unreasonableness with respect to actions taken by the parents." 34 C.F.R. § 300.148(d)(3).

### C.  The Board Complied with the IDEA.

The IHO correctly concluded that the Board offered Student an appropriate program that provided FAPE in the least restrictive environment. The Board complied with the requirements of the IDEA when it (1) conducted its initial evaluation and determined Student eligible and (2) developed and implemented an IEP reasonably calculated to provide a meaningful educational benefit to Student. The IHO's determination is amply supported by the Record.

 In undertaking an analysis under the IDEA, courts proceed with an initial two-part review. "First, the court asks whether the State complied with the procedures set forth in the Act. Second, the court asks whether the IEP developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012) (citation and internal quotations omitted).

### 1.  The Board complied with the procedural requirements of the IDEA.

Plaintiffs' contention that the Student was deprived of a FAPE because the Board failed to have an IEP in place on the first day of school and that that failure somehow justifies their unilateral placement of the Student at a private school is without merit. (*See* Complaint, ECF 1, at ¶ 41). First, the Board was not required to have an IEP in place for the Student until the Board determined that she was eligible for services under the IDEA. Having an IEP in place within a handful of days after the Student's first day was the result of a herculean effort undertaken for the Student's wellbeing when in fact the Board had weeks in which to make its assessment and

develop an IEP. Moreover, the absence of an IEP for a mere seven school days could not have caused the substantive denial of FAPE because the Board provided services comparable to those enumerated in the NYC IEP even though it was under no obligation to do so.

> **a.  The NYC IEP is not binding on a Connecticut school district.**

The Student was due for a re-evaluation in New York as of the end of the 2018-2019 school year. Thus, the NYDOE IEP had by its terms expired by the time the Student moved to Connecticut in August 2019. (*See* NYC IEP, Board Ex. 11, ECF 25-6 at 20, 33 (Reflecting IEP meeting date of August 6, 2018 and annual review date of August 7, 2019)). But even had it not expired, an IEP from one state does not determine the eligibility for special education services in a different state. Rather, each state is entitled to make its own eligibility determination. *See A. v. Greenwich Bd. of Educ.*, No. 3:15-CV-00203 (CSH), 2016 WL 3951052, at *11 (D. Conn. July 20, 2016) ("the previous IEP carries no imprimatur of correctness in the new state and therefore an initial evaluation must be conducted"); *see also Michael C. ex rel. Stephen C. v. Radnor Township Sch. Dist.*, 202 F.3d 642, 651 (3d Cir. 2000) ("We hold that the IDEA's overall scheme and the precedent interpreting that scheme leads inexorably to the conclusion that when a student moves from State A to State B, any prior IEP in effect in State A need not be treated by State B as continuing automatically in effect.").

Thus, until the Board evaluated the Student and made its own eligibility determination pursuant to Connecticut standards, the Student was not a "child with a disability" within the meaning of 20 U.S.C. § 1401(3) from the viewpoint of a Connecticut educational agency. *See* 20 U.S.C. § 1414(a)(1)(A) ("A State educational agency, other State agency, or local educational agency *shall conduct a full and individual initial evaluation* … before the initial provision of special education and related services to a child with a disability under this subchapter.")

(emphasis added). Accordingly, the statutory requirement relied upon by the Plaintiffs that the Board have in place an IEP at the beginning of the school year does not apply. *See* 20 U.S.C. § 1414(d)(2)(A) ("At the beginning of each school year, each local educational agency … shall have in effect, *for each child with a disability in the agency's jurisdiction*, an individualized education program ….") (emphasis added). The Student here was not a "child with a disability" until the Board made its determination of eligibility, which it did at the PPT meeting on September 9, 2019.

### b. The Board's evaluation and development of an IEP was timely.

The Student's family moved to Greenwich on August 27, 2019. Until she actually became a resident of the Greenwich school district, the Board was not in a position to offer any school accommodations to the Student. *See* Conn. Gen. Stat. § 10-186. Thus, it was not possible for there even to be a referral for special education services at least until the date the Student became a Greenwich resident.[6]

Moreover, after there has been a referral for special education services and such services are found to be appropriate, Connecticut law provides that an IEP must be implemented within forty-five days of an initial referral. Conn. Agency Regs. § 10-76d-13(a)(1).[7] As "days" under the applicable Connecticut regulations are "school days,"[8] in this case the Board was not required to have an IEP in place for the Student until the last week of October *at the earliest*.[9]

---

[6] Plaintiffs also overlook that Connecticut law provides that the school year begins on July 1, not the first day of classes. *See* Conn. Agency Regs. § 10-76d-1. Thus, it was a factual impossibility to have an IEP in place *before* the Student even came to Greenwich to register in mid-August.

[7] This regulation is entirely consistent the requirement of the applicable federal regulation that a meeting to develop an IEP must be held within thirty days of a determination of eligibility, which in this case happened at the September 9, 2019 PPT meeting. *See* 34 C.F.R. § 300.323(c).

[8] Conn. Agency Regs. § 10-76a-1(5).

[9] In that regard, Connecticut law expressly provides that where, as here, the referral is made between school years, "the effective date of the referral may be deemed to be the first school day of the next school year." Conn. Agency Regs. § 10-76d-13(b). Thus, under any circumstances, the forty-five-day period did not begin to run until the first day of classes at CMS on August 29, 2019.

In *Mr. & Mrs. B. v. Newtown Bd. of Educ.,* No. CIV.A. 3:06-CV-00217, 2008 WL

762179, at \*3 (D. Conn. Mar. 20, 2008), this Court held that the inability to complete an IEP by

the first day of classes cannot be a procedural deficiency under the IDEA where there are not a

sufficient number of school days between the referral request and the commencement of classes.

That was the case here.

Thus, while the staff of CMS engaged in the extraordinary effort to convene a PPT by

September 9, including the provision of the statutory required notice to the Parents,[10] and

developed an IEP for immediate implementation, the Board was under no legal obligation to

have an IEP in place within that constrained time period. The absence of an IEP for the first few

days of classes at CMS therefore did not deprive the Student of any procedural right afforded to

her under the IDEA.

Here, the Student was evaluated at the PPT meeting on September 9, 2019. The record is

clear that, upon identification of the Student as a "child with a disability," the Board

expeditiously designed an IEP and implemented it immediately, on the day following the PPT

meeting on September 9, 2019. The initial evaluation and development of Student's IEP all

occurred well within the 30 day requirement prescribed by federal regulation. *See* 34 C.F.R. §

300.323(c)(1).

### c.  The Board met any obligation to the Student by implementing the NYC IEP.

The IDEA and its implementing regulations expressly address only a transfer of a student

between states *within the same academic year*. *See* 20 U.S.C. § 1414(d)(2)(C); 34 C.F.R. §

300.323(f). In that circumstance, the law requires the transferee State to provide the student with

---

[10] Connecticut law requires notice of five school days before a PPT meeting. Conn. Agency Regs. § 10-76d -12(a). September 9 was therefore the first school day following the August 29 notice on which a PPT meeting could have been held.

a FAPE "including services comparable to those described in the child's IEP from the previous public agency." 34 C.F.R. § 300.323(f). As demonstrated above, this provision does not apply to a transfer *between* academic years, as was the case here. Yet, while under no obligation to do so, the Record demonstrates that CMS staff reviewed the lapsed NY IEP and correlated the services recommended in that expired IEP to the classes that would be made available to the Student upon her arrival at CMS. (*See, e.g.,* 12/10 Davis Test., ECF 25-8 at 730-31).

Specifically, CMS counselor Michele Davis testified that she coordinated with the special education administrator to review the Student's IEP and determine the most appropriate academic class placements at CMS based on the recommendations in the NYC IEP. (*Id.* at 730). For example, that IEP recommend small classes, so the CMS team placed her in its "skills" classes, which would have been the most correlative and a daily academic lab. (*Id.* at 735).[11] This essentially meant placement in grade-level, general education classes with specialized support. In terms of the special education program and services set out in the NYC IEP, that IEP recommend that the Student receive specialized services in a general education setting, with special education teacher support services provided on a pull-out and push-in basis. (*See* NYC IEP at 10, ECF 25-6 at 29). Moreover, the special education teacher, Ms. Baumeister, testified that she saw the Student every day for forty-five minutes per day in a small-group setting as well as during the Student's academic lab class in the resource room. (9/16 Baumeister Test., ECF 38 at 214-15).

The Board provided comparable services to those recommended in the NYC IEP until it made its eligibility determination and created its own IEP on September 9, 2019, which remained in place, as modified, at least through the remainder of the school year. The record establishes that the Board made available special education support to the Student from her first day of

---

[11] The Board's "skills" classes are "for students slightly below grade level [who] need a little bit more help … than they would get in a co-teach setting."  (9/16/20 Baumeister Test., ECF 38 at 195).

classes at CMS. Thus, even if Plaintiffs are correct that the Board can be faulted procedurally for the impossibility of having an IEP in place on August 29, 2019, it is clear that they are not entitled to relief.

### d. Even if there was a procedural violation, the Record does not support the denial of a FAPE.

A failure to receive a FAPE based on a procedural violation can be found only if the procedural inadequacies (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of education benefit." 34 C.F.R. § 300.513(a)(2); *see also C.M.. v. Bd. of Edu. c. of Union Cnty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 881 (3d Cir.2005). In this case, even if the Board was required to have an IEP in place on the first day of classes at CMS, which it was not, the Plaintiffs have failed to demonstrate any of the factors that would support a finding that the Student was denied a FAPE. There is no dispute that the Parents were invited to participate, and did participate, in all of the PPT meetings regarding the Student. *See White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003) (right to provide input is not the right to dictate the outcome).

While it was under no legal obligation to do so, the Record shows that the Board assembled a team of educators, counselors and administrators to review and develop an initial class schedule based on the NYC IEP and parental considerations to implement as of the first day of school. That effort was supplemented by the development and implementation of a full IEP within seven days after the start of classes at CMS on August 29.

In *Myles S. By & Through SS v. Montgomery Cnty. Bd. of Educ.*, the court found that the student was not harmed by a "brief two-week delay" when a preparatory IEP was used from the time between the first day of school and the IEP meeting. 824 F. Supp. 1549, 1555 (M.D. Ala.

24

1993). There the student applied in April for the following school year's public pre-school. *Myles*, 824 F. Supp. at 1552. Despite its finding that the district in fact violated several procedural IDEA requirements, the court held that "the school system made a good faith effort to follow the regulations" and therefore "substantially complied with the provisions of the IDEA." *Id*. at 1555, 1562. Here, the record plainly establishes that the Board complied in good faith with its obligations under the IDEA and Connecticut law. *See also GB v. New York City Dep't of Educ.*, 145 F. Supp. 3d 230, 245–46 (S.D.N.Y. 2015) (established procedural violation did not deny FAPE, significantly impede meaningful participation or cause a deprivation of educational benefits).

### 2. The Board Complied with the substantive requirements of the IDEA by providing an IEP reasonably calculated to provide a meaningful benefit.

Once a child has been determined eligible, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for who it was created. It must set out a plan for pursuing academic and functional advancement." *Braden O. v. West Chester Area Sch. Dist.*, No. CV 16-0071, 2017 WL 2869397, at *3 (E.D. Pa. July 5, 2017) (internal quotations and citation omitted). A school district must develop an IEP for the child that is "'reasonably calculated to enable [the student] to make progress appropriate in light of the child's circumstances.'" *Endrew F.*, 137 S. Ct. at 1001; *see also* 20 U.S.C. § 1414(d). The IHO properly found Board personnel credible "about the substance of the IEPs prepared for Student and the strategies and concepts being used to compose [Student's] program." (IHO Decision, ECF 1-1, at 20). Additionally, included in a FAPE is the requirement that the child be educated in the least restrictive means possible. *See* 20 U.S.C. § 1412(a)(5).

### a. The IEP for the 2019-2020 academic year provided a FAPE.

The Record demonstrates that the Board made thorough, diligent, and well-reasoned recommendations in developing Student's IEP to ensure Student received FAPE in the least restrictive means. After determining eligibility and identifying Student's areas of need, the PPT developed an IEP, worked diligently to implement the IEP (in spite of the Parents' lack of cooperation and their weeks of surreptitious planning for the Student's unilateral removal), monitored the Student's learning, and recommended changes to the IEP as necessary to meet the Student's needs.

In connection with the development of the initial IEP, the Recommendations section of IEP notes that the school team "explained that the proposed goals and objectives are based on [Student's] prior IEP from New York and a neuropsychologist report included with her records and shared these draft goals and objectives with the team."[12] (Board Ex. 9, ECF 25-6 at 2). The PPT reviewed the goals and objectives as well as numerous accommodations (thirteen accommodations) to support the Student's access to, and progress in, general education. (*Id*.). Mrs. R testified that she participated in the development of the IEP, providing additional information about Student. (2/24 Test. of Mrs. R, ECF 25-8 at 1240). In agreeing with the goals of the IEP, Mrs. R admitted that the September IEP created by CMS was consistent "on paper"

---

[12] Though the Board was not required to adopt or implement the Students prior NYC IEP, the Greenwich IEP was similar in sum and substance. For example, the NYC IEP reflected the Student's instructional reading level to be at grade level; the student's math level was determined to be below grade level (Board Ex. 11, ECF 25-6 at 33). Accordingly, the skills addressed through the NYC IEP included Reading (identifying character traits, themes, character changes, improving inferential reading, and improving reading stamina), Writing (planning writing essays), Math (solving multi-step word problems and solving multiplication and division problems through algorithms), Social skills, Coping skills, and Self-confidence. (*Id*. at 26-7). The NYC IEP reflected that all classes for core academic subjects would be located in general education classrooms with special education supports integrated into the general education class, together with push in and pull out special education supports five class periods per week and counseling sessions, one individual and one group session for forty minutes each per week. (*Id*. at 29). The NYC IEP recommended counseling support, to be delivered outside of the general education classroom, to address the development of coping skills and self-confidence. (*Id*.). Notably, Plaintiffs did not contest the NYC IEP or challenge its substantive recommendations via a request for a due process hearing. (2/24 Test. of Mrs. R. at 192-93, ECF 25-8 at 1313-14).

with Student's NYC IEP (*id*. at 1022), which Plaintiffs never challenged. (IHO Decision, ECF 1-1 at 5). The PPT recommended that the IEP go into effect immediately (*see* Board Ex. 9, ECF 25-6 at 2), and Mrs. R agreed with implementing the IEP immediately. (2/24 Test. of Mrs. R, ECF 25-8 at 1240).

The IEP initially recommended Academic Lab 5 times for 46 minutes per week and special education math skills class five times 46 minutes per week (Board Ex. 9, ECF 25-6 at 15), individual counseling one time 20-minutes per week and small group counseling one time 30-minute per week.[13] (*Id.*). The IEP also provided the student with numerous accommodations and modifications to support the Student's access to learning throughout the school day.[14]

---

[13] The September IEP targeted the Student's development of the following skills to support her acquisition of general education curriculum:
- Identifying key information and questions in multistep word problems to solve the problem
- Writing number sentences to accurately represent multistep word problems
- Solving multistep word problems independently
- Planning and organizing her schoolwork by checking her Aspen/Schoology account to determine if there are any missing assignments or school work that needs to be re-done and tracking the completion of missing work
- Developing a plan to complete missing work
- Completed or turning in the missing work and updating her missing work log accordingly with teacher approval or sign off
- Identifying her feelings during the school day
- Identifying preferred coping strategies to apply to identified feelings during the school day
- Identifying personal feeling and triggers for those feelings in social situations
- Identifying other people's feelings in social situations
- Identifying replacement behaviors n social situations

(Board Ex. 9, ECF 25-6 at 8-11).

[14] The IEP also identified a number of accommodations and modifications to support the Student's learning, including (*id.*. ECF 25-6 at 2, 12):
- Access to a calculator
- Graphic organizers, including for science
- Extra time for tests, projects and written work
- Ability to take tests in an alternate setting
- Assignment pad, breaking down long term assignments with additional due dates
- Posting assignments
- Posting routines
- Providing study outlines
- Preferential seating
- Offering breaks between tasks
- Facilitating personal coping skills and strategies
- Modeling expected behavior
- Providing the Student with options for self-regulation

The Board's recommendations also ensured that her education was provided in the least restrictive environment with her nondisabled peers in English, science and social studies. In that regard, the Student was initially enrolled in a mix of general education classes at grade level with paraprofessional support and skills classes (English/ELA and math) taught by a special educator. (2/24 Healy Test., ECF 25-8 at 488). It became evident to the Student's teachers at CMS that she could succeed in a general education English class with integrated special education supports, instead of a special education skills English class. (11/9 Test. of Ms. Baumeister, ECF 25-8 at 35). With the agreement of the parents, the Student was moved to the new English class, which was determined to be the least restrictive environment. (*Id.* at 31-33; 1/19 Test. of Ms. Davis, ECF 25-8 at 735).

Although Mrs. R testified that the Student required one-to-one special education instruction, the NYC and Connecticut IEPs, informed by assessment results, did not support such a highly restrictive placement. In fact, a parent-initiated evaluation of the Student in October 2019 confirmed that the Student performed in the average- to above-average rage in the area of reading and writing, with the evaluator noting that the Student's writing was in the superior range. (Board Ex. 8, ECF 25-5 at 109).

The CMS team met multiple times each week to discuss the Student and ways that the team could support her learning, including strategies to help her access the general education curriculum.[15] (*See* 9/16 Outhouse Test., ECF 38 at 86-87). The team monitored the Student's

---

- Checking the Student's work in progress
- Cueing and prompting the Student
- Providing instructional models
- Providing the Student with notes or outlines
- Repeating instructions provided during class
- Reviewing directions provided during class

[15] Mr. Outhouse, the Student's general education science teacher, testified that the strategies were effective for the Student. The challenge was that when "you're trying to implement strategies like this having consistency in the

academic performance, communicated regularly, convened four PPT meetings in the span of five
calendar months, and recommended programming changes to enhance the Student's access to
and progress in the eighth-grade curriculum. (*Id. see* IEPs of 9/9/19, 10/4/19, 11/1/19 and
1/14/21, Board Exs. 2, 3, 7, ECF 25-5 at 11, 42, 66, & Ex. 9, ECF 25-5 at 1; 11/17 Napoletano
Test., ECF 25-8 at 231-32; 12/10 Healy Test., ECF 25-8 at 512-13).

  For example, the CMS team became concerned about a pattern of late arrivals to CMS
and on September 26 – just twelve school days following the September 9 PPT meeting – and
sought to collaborate with the Parents on the development of a plan (school avoidance plan or
SAP) to support the Student's timely arrival to school.[16] The CMS team offered to partner with
the family to support the Student's consistent timely arrival at school, suggesting a specific
nighttime and morning routine as well as offering resources, through community-based
providers, to support the family and Student at home. The CMS team convened a PPT meeting
on October 4, formally adopting the SAP and enhancing the Student's IEP to include goals and
objectives to develop the Student's coping strategies in further support of the Student's timely
school attendance. (Board Ex. 7, ECF 25-5 at 75, 76 & 83).[17] Between October 4 and the next
PPT meeting on November 1, 2020, the CMS team contacted the Parents at least twenty times to
support the Student's timely arrival at school. (*See* Board Ex. 5, ECF 25-5 at 64). The Student's
team continuously worked to support the Student, scheduling a home visit on October 18, which
the Parents cancelled. 12/10 Napoletano Test., ECF 25-8 at 426-27, 457-58; 12/10 Healy Test.,
ECF 25-8 at 512-13).

---

classroom definitely helps, so it's difficult to test strategies, revise strategies if the student does not come to class on
a regular basis." (Outhouse Test., ECF 38 at 73).
[16] Mrs. R. testified that the Student would stay up at night and not wake up for school (2/24 Test. of Mrs. R, ECF 25-
8 at 1277-78).
[17] Unbeknownst the CMS team, by October 4, the Parents had already sought (on October 2) and received (on
October 3) an immediate placement for the Student at Winston Prep.

The PPT convened on November 1, 2019 and again offered to work with the family to support the Student's timely attendance at school which would, in turn, facilitate the development of deeper relationships with the Student to support her school engagement. The Parents asked the CMS to suspend the implementation of the SAP. (*See* Board Ex. 3, ECF 25-5 at 43).

The CMS team convened a fourth PPT meeting on January 14, 2020 to consider the Student's educational program based on an evaluation conducted by Dr. Riordan and information from Norwalk Winston Prep regarding on-going school avoidance and challenges with work initiation and completion. The PPT recommended conducting a functional behavioral assessment of the Student to address concerns with the Student's work initiation and completion. (Board Ex. 2, ECF 25-5 at 12). Additionally, although the Student's performance on reading comprehension assessments was within the average range, the PPT recommended academic support through Academic Lab, to address relative weaknesses in higher level reading comprehension skills. (*See* Board Ex. 8, ECF 25-5 at 96-97; 11/17 Riordan Test., ECF 25-8 at 336)

Student's team at CMS testified that the IEPs developed and attempted to be implemented at CMS were appropriate for the Student. (*E.g.* 12/10 Napoletano Test., ECF 25-8 at 433; 9/16 Outhouse Test., ECF 38 at 131-32; 1/19 Healy Test., ECF 25-8 at 673). The IEPs at issue prior to the Student's unilateral removal in October 2019 were based on the NYC IEP, assessments of the Student's skills, observations of the Student's functioning across the school day, and the collective recommendations of experienced, caring educators who worked hard, in spite of parental interference and gamesmanship, to support the Student.

The Greenwich IEP provided the Student with daily special education support in her math, English and Academic Lab classes. She had regular access to the school psychologist, Ms.

30

Napoletano, and scheduled individual and group counseling. In addition, she had numerous

accommodations in each of her classes to ensure that she could access the curriculum and

instruction. The Student responded well to the supports when she was in attendance (9/16

Outhouse Test., ECF 38 at 147-50). The issues of timely arrival affected the Student's access to

supports, some of which were scheduled, by design, for the start of the school day. (1/17

Napoletano Test., ECF 25-8 at 228). Rather than working with the CMS team, through the SAP

and the suggested community-based supports and resources, to help the Student engage in

consistent school attendance and experience success at CMS, the Parents enrolled the Student in

Winston Prep (consistent with their planning as early as November 2018), withheld this

information from the Student's teachers and PPT, and then attempted to blame the CMS team

and the alleged inadequacy of the IEP for the Student staying up late at night and not getting to

school on time in the morning.

The SAP and supports offered by the CMS team were reasonable and appropriate to

address the issue of timely school attendance. The CMS team correctly surmised, from the 2018

evaluation report, the NYC IEP and discussions with the Student, that the Student's tardiness

was not caused by school-based anxiety or a fear of CMS. Rather, the family needed support in

developing and adhering to consistent routines at night and in the morning to promote timely

transition from home to school. Dr. Riordan later confirmed this understanding, testifying that

the tardiness issue was caused by "her perfectionism and getting things ready in the morning,"

and she further explained that the Student struggled in the morning with "preparing her breakfast

and her lunch or something." (11/17 Riordan Test., ECF 25-8 at 341-42). The plan developed by

the CMS Team, which provided the family with clear routines and timelines for nighttime and

morning transitions, appropriately targeted and addressed the underlying barrier for the Student.

The Parents assert that the IEP was not appropriate based on (i) composition of the classes at CMS, (ii) class sizes at CMS, and (iii) lack of progress in the CMS program. Such claims fail. Consistent with recommendation of NYC IEP and the results of the Student's assessments, Student was recommended for placement in general education settings with supports and accommodations, except for math skills class and academic lab. The Record demonstrates that the Student's classes at CMS were appropriate to meet her needs. The Student's English class had less than twenty students and was supported by a special education teacher and paraprofessional, providing the Student with a low teacher-student ratio. (10/8 Baumeister Test., ECF 38 at 245, 281). Similarly, the Student's general education science class has a low student-teacher ratio with a total of 12 students in the class. (ECF 25-5 at 488). The Student's math class was a specialized class only for students with IEPS and was taught by a special education teacher. (*See* 12/10 Healy Test., ECF 25-8 at 488-49). The Student's academic lab support class was small group (no more than 6 students) and taught by a special education teacher. (*See* Board Ex. 9, ECF 25-6 at 15). The record establishes that the classes at Winston Prep were similar in size, with class sizes ranging from 8 to 12 students. (10/8 Yanotti Test., ECF 38 at 369).

The Parents also point to the Student's lack of "progress" at CMS to support their claim that the IEP was not designed to help the Student. As demonstrated by the Record, the IEP developed for the Student, as initially designed and further refined over the course of the 2019-2020 school year, was appropriate to meet her needs. From September 9 until the time the Parents made the decision to seek immediate placement at Norwalk Winston Prep – which the Parent testified occurred on October 2, 2019 – there had been a total of sixteen days of school, or approximately nine percent of the school year. (*See* Academic Calendar, Pls.' Ex. 28, ECF 25-4

32

at 44). The CMS team focused on building rapport and relationships with the Student to help the

Student access and make progress in her IEP program. When it became clear that the Student's

difficulty with morning routines at home were affecting the consistency of the relationships with

teachers, the CMS team offered collaboration with, and support to, the family to promote the

Student's timely attendance at school. Mr. Healy, the CMS school administrator, explained that

"we were trying to work on the plan to support her in the home and morning environment in

getting to school so that we could continue to build those relationships. It's hard when they are

inconsistent to build connections with both peers and teachers in the school building." (12/10

Healy Test., ECF 25-8 at 538). Numerous Board witnesses credibly explained that academic

progress required consistent, timely school attendance to build trust and working relationships

with new teachers in a new environment. As explained by school psychologist Napolitano, "to

make progress you need to build a rapport and with this student it took quite some time to build

rapport and most of the beginning of the school year was spent doing that." (12/10 Napoletano

Test., ECF 25-8 at 423-24). Mr. Outhouse, the Student's science teacher, similarly testified that

he experienced success with the Student when she came to class and he was able to build a

working relationship with her.[18] (9/16 Outhouse Test., ECF 38, at 148-50). There is ample

evidence that the Student's school attendance and her connection to her CMS team and peers

plummeted once the Parents renewed the admissions process with Winston Prep for its Norwalk

Campus. (Board Ex. 1, ECF 25-5 at 406; 12/10 Napoletano Test., ECF 25-8 at 424). As

explained by school psychologist Napolitano and special education teacher Baumeister, the

---

[18] Mr. Outhouse described a particularly positive experience with the Student on October 17 when the Student was in school on time and being observed as part of Dr. Riordan's evaluation. "I was like super excited about the things that we just achieved together, so I thought we were moving in the right directions with the student. I thought we almost had like a breakthrough, you know, maybe the things I was doing for her were finally helping and she was getting comfortable in school, and then right that observation I, again, we'd have to look at the attendance, but I don't even recall ever seeing her again after that observation." (9/16 Outhouse Test., ECF 38 at 148).

Student understood that she would be leaving CMS and did not see any point in building relationships at CMS. Further, the IEP program developed on September 9, 2019 (the first day of implementation) was designed to be achieved over the course of an entire school year. It is not reasonable to assess the appropriateness of the IEP program based on sixteen days of school, particularly where, as here, the Board's implementation of the IEP is affected by parental interference or gamesmanship.

### b. The IEP for the 2020-2021 academic year provided a FAPE.

The Record also establishes that the Board fulfilled its responsibilities to the Student in connection with the 2020-2021 school year, for the Student's ninth-grade year at Greenwich High School. The Board convened PPT meetings in July and August 2020 to consider the Student's needs and design an annual program to meet those needs in the least restrictive environment. (Board Ex. 15, ECF 25-6 at 76-100; Board Ex. 17, ECF 25-7 at 1-36). On July 21, 2020, the PPT met to review the Student's current IEP (which would remain in effect until the Student's projected annual review on or before September 8, 2020) and determine the implementation of the IEP for ninth grade. (Board Ex. 15, ECF 25-6 at 76-100). Mrs. R. attended and presented information to the PPT regarding the Student's needs and her performance at Winston Prep. (*Id.* at 76-77). The PPT recommended continued special education services to support the Student's development of skills, as outlined in the goals and objectives, in the area of planning and organization, math problem solving, higher order reading comprehension, self-awareness, school attendance, coping skills, and friendship skills. (*Id.* at 85-95). The PPT recommended that the Student work with special education teacher in a small group within a resource room setting to develop these skills through academic lab for 53 minutes per session nine times in an eight-day cycle. (*Id.* at 77, 99).

At the annual review meeting held on August 26, 2020, the PPT convened with Greenwich High School educators and Parents in attendance.[19] In preparing for the PPT meeting, Greenwich High School educators reviewed the available information regarding the Student, including the Student's educational record from CMS, the narrative summaries from Winston Prep, and report cards. (1/22 Shaw Test., ECF 25-8 at 874). The PPT recommended new goals and objectives targeting the development of specific skills in the areas of math problem solving, inferential comprehension, organization and planning of writing, self-awareness and self-regulation, self-advocacy, monitoring and planning of assignments, and career exploration. (*See* Board Ex. 17, ECF 25-7 at 11-23). The PPT recommended that the Student receive direct support in the development of the academic skills in the resource room within a small group for 53 minutes, nine times within the eight-day high school schedule. (*Id.* at 27). In addition, the PPT recommended that the Student work directly with the school psychologist or social worker, on an individual basis, two times in an 8-day cycle for a total of 41 minutes. (*Id.*) The PPT also recommended an additional accommodation for teachers to preview, predict and activate the Student's background knowledge to support the Student's comprehension. (*Id.* at 24). The PPT recommended placement at Greenwich High School and discussed that specific course selections, including specific classes, to be informed by Greenwich High School placement tests. (12/17 Patti Test., ECF 25-8 at 986-87).  The Greenwich High School educators credibly testified that the IEP developed for the Student's ninth grade was appropriate to meet her need, (1/22 Shaw Test., ECF 25-8 at 883).

---

[19] In addition to conducting the annual review, the PPT also discussed and planned the Student's triennial reevaluation. The process of reevaluations under the IDEA is set forth in 20 U.S.C. § 1414(a)(2) and 34 C.F.R. § 300.303, both of which provide that an educational agency at least once every three years. The PPT recommended conducting a triennial reevaluation of the Student, specifically recommending a comprehensive academic, social and emotional assessment of the Student. (Board Ex. 17, ECF 25-7 at 29-36).

Mrs. R. acknowledged, on cross examination, that she was aware of the placement test process and did not schedule placement testing at Greenwich High School "because we believed my daughter's placement was appropriate at Winston Prep." (2/24 Test. of Mrs. R, ECF 25-8 at 1301). Had the Student been made available for the placement testing, the Greenwich High School team would have been able to provide the Student with specific recommendations for academic class selections in core academic areas. (12/17 Patti Test., ECF 25-8 at 987). The evidentiary record establishes – as the hearing officer correctly concluded – that the subsequent IEPs developed by the Board, including the IEPs developed in July and August 2020, were appropriate to further the Student's academic, social and emotional development.

## D.  The Plaintiffs Are Not Entitled to Tuition Reimbursement.

Plaintiffs failed to demonstrate that the IHO's decision should be overturned, thus the Board is entitled to judgment as a matter of law. However, even in the unlikely event that Plaintiffs could overcome the Record and the educational opinions therein and prevail on a claim that Student was denied a FAPE, they are not entitled to reimbursement for their unilateral placement of the Student. As noted above, under the *Burlington/Carter* standard even if the Court concludes that a child was denied a FAPE, reimbursement may be reduced or denied "[u]pon a judicial finding of unreasonableness with respect to actions taken by the parents." 34 C.F.R. § 300.148(d)(3). *See Forest Grove Sch. Dist. v. T. A*., 557 U.S. 230, 247 (2009). Indeed, the Supreme Court declared that an IHO "must consider all relevant factors" to determine whether the equities favor reimbursement. *Id*. at 247. The Court has also held that fact finders enjoy "broad discretion" to adjust or eliminate reimbursement due to equitable considerations. *Carter*, 510 U.S. at 16; *see also Frank G.*, 459 F.3d at 376 ("we have held that it is inequitable to permit reimbursement under [certain] circumstances"); *see also Gagliardo v. Arlington Cent.*

36

*Sch. Dist.*, 489 F.3d 105, 111 (2d Cir. 2007); *R.R. v. Scarsdale Union Free Sch. Dist.*, 615 F. Supp. 2d 283, 288 (S.D.N.Y. 2009) (each reviewing hearing officer decisions to completely eliminate reimbursement based on equitable considerations); *S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 364 (S.D.N.Y. 2009) (denying reimbursement on equitable grounds where the parent enrolled the student in private school prior to visiting the proposed public school placement and delaying notice of this decision to the school district); *T.M. v. Kingston City Sch. Dist.*, 891 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2012) (denying tuition reimbursement for private school unilateral placement where the parents interfered with the IEP team process, including entering into a contract with the private school before team met to discuss student's needs).

In this case, the IHO expressly found that "the Parents made the decision for unilateral placement without giving the Board a reasonable chance to implement its plan for the Student." (IHO Decision, ECF 1-1, at 21). Indeed the IHO went on to conclude that "the Parents effectively thwarted the Board's ability to do the job it was mandated to do." (*Id.*). These findings are amply supported by the Record and preclude relief in this case.

First, the Parents interfered with the cooperative process by rebuffing the CMS Team's effort to transition the Student to her new school environment. The Student moved from New York City to Greenwich essentially on the first day of classes, she no longer had the support of her private therapist,[20] she needed assistance with transitions,[21] and she had negative peer

---

[20] The Student's private therapy was discontinued when she moved from New York City and did not begin again until January 2020. (2/24 Test. of Mrs. R, ECF 25-8 at 1270-71).
[21] The record shows that the Student had difficulty with transitions. (*See* NYC IEP, Board Ex. 11, ECF 25-6 at 23; 11/9 Baumester Test., ECF 25-8 at 16-17). Here she was experiencing a great deal of transition, including transitioning to a new home, a new school, and new teachers.

experiences at her prior schools.[22] Any claim that it was deficiencies in CMS's program that led to the Student's rough start at CMS is inherently suspect.

While the Parents allege that school avoidance was a problem for the Student, it is interesting to note that CMS's attendance record reflects that between August 29 and September 26 (the date of the first visit to the Winston Prep Norwalk campus), the Student was absent twice and tardy seven times. But between September 26 and October 29 (the Student's first day at Winston Prep), she was absent eleven times and tardy seven times. (*See* Attendance Record, Board Ex. 1, ECF 25-5 at 406).

The Parents' lack of good faith is demonstrated clearly by the alleged school avoidance issue. Upon learning of this alleged problem, the CMS team developed a detailed school-avoidance plan to assist the Parents and the Student with coming to school. CMS sought and obtained the Parents' commitment to that plan, but despite Mrs. R's agreement, the Parent did not cooperate in the implementation. (*See, e.g.,* 12/10 Napoletano Test., ECF 25-8, at 457-58). The alleged issue did not magically resolve when the Student began at Winston Prep. Mrs. R admitted that the Student would sit in the car in the parking lot for thirty to forty minutes while Norwalk Winston Prep staff tried to get her to come into the building. 2/24 Test. of Mrs. R, ECF 25-8 at 1175). In fact, its representative testified that the school avoidance issues took time, until approximately February 2020 to improve. (10/8 Yanotti Test., ECF 38 at 380). Not surprisingly, this required the establishment of a degree of trust between the Student and the school. (*Id.* at 378). This was precisely what the CMS team was attempting to establish via its school avoidance plan. The difference is the Parents' willingness to tolerate the process at Winston Prep. Had the

---

[22] *See* Board Ex. 12, ECF 25-6, at 45.

Parents honored the commitment to the school-avoidance plan, the issues would have resolved at CMS in a like fashion.

In view of the Record as a whole, it is that the Parents failed to come to the IEP development process with an open mind, having determined well prior to stepping foot in CMS that the Student would be educated at Winston Prep and not in a local public school. Parents claimed that when they toured Norwalk Winston Prep on Sept 26 that they intended to look at the school for ninth grade (approx. September 2020). The facts elicited at the hearing, largely through cross examination and an interim order of the IHO, belied that claim. The application for admission – produced by the Parent on the final day of hearing (and after the IHO's order) –  was an application for the New York Campus completed a year prior, not for the Norwalk campus.[23] (2/24 Test. of Mrs. R., ECF 25-8 at 1145-47). More importantly, the application was not for the Student's ninth grade school year, which would be the 2020-2021 school year. The application was for the 2019-2020 school year. (*See id.*; *see also* Application (Board Exhibit 28) attached hereto at Tab A).[24] In connection with the Student's application for the subsequent school year (2020-2021) at the Norwalk campus, the family sought admission through a private tour on September 26 (that was arranged just a few days ahead of time), a shadow day a few days later, and an acceptance letter received less than twenty-four hours after the shadow visit and without the submission, or benefit of, an updated evaluation report or the Student's current IEPs. (2/24 Test. of Mrs. R, ECF 25-8 at 1151-52; *id.* at 1255 (private tour), 1261-62 (shadow day); Pls.' Ex. 30, ECF 25-4 at 61 (Oct. 3 2019 acceptance letter)). The Parents informed Norwalk Winston

---

[23] Because that application, which was Board Exhibit 28, is not included in the record filed with the Court, the Board attaches a redacted copy to this Memorandum at Tab A.

[24] It is also notable that, even though the Kornblueth evaluation addressed some of Student's learning disabilities, the Parents did not provide it to Greenwich. Mrs. R admitted that she did provide it to Winston Prep. (2/24 Test. Mrs. R at 100-01, ECF 25-8 at 1220-21).

Prep of their desire for the Student to have an immediate placement on October 2 (2/24 Test. of

Mrs. R, ECF 25-8 at 1262), and received acceptance from Winston Prep the very next day. And,

while the Parents attended a PPT meeting on October 4, they did not did not inform the team that

they had just sought and received admission with immediate placement at Norwalk Winston

Prep.

## V.    CONCLUSION

For all the reasons discussed above, the Board respectfully requests that judgment be

entered in favor of the Board.

DEFENDANT,
GREENWICH BOARD OF EDUCATION,

By:  /s/ Patrick M. Fahey
        Patrick M. Fahey (ct13862)
        Andreana R. Bellach (ct21302)
        SHIPMAN & GOODWIN LLP
        One Constitution Plaza
        Hartford, CT 16013
        Tel.: (860) 251-5000
        Fax: (860) 251-5219
        pfahey@goodwin.com
        abellach@goodwin.com

        Abby R. Wadler (ct28051)
        Town Hall, Law Department
        101 Field Point Road, P.O. Box 2540
        Greenwich, CT 06836-2540
        Tel.: (203) 622-7876
        Fax.: (203) 622-3816
        abby.wadler@greenwichct.org

        Its Attorneys

11380674

# A

Board Ex. 28 (redacted)



**Winston Preparatory School**
*education for the individual*

## NY APPLICATION for the 2019-2020 Academic Year

### 1. APPLICANT INFORMATION

Legal name of applicant___

Preferred nickname (if any)___                    Date of birth  7/26/06

Home address___

_New York_ — City    _NY_ — Street/State    _10021_ — Zip Code    _USA_ — Country

Have you applied to WPS in the past? ☐ Yes  ☑ No   If yes, when did you apply?___

Current school  _Fusion Academy – Park Avenue_

Current grade  _7_   Applying for grade  _8_   Are you interested in immediate placement? ☐ Yes ☑ No

School address  _450 Park Ave South NYC 10016_ — City/State/Zip Code   Telephone  _212 326-9522_

Former school(s):  _York Preparatory School_   from _9/17_ to _6/18_
_P.S. 6_   from _9/11_ to _6/17_
___   from ___ to ___

### 2. HOUSEHOLD INFORMATION
Please complete the following information, as applicable.

**HOUSEHOLD NO. 1**

PARENT/GUARDIAN

Name___

Relationship to applicant  _Mother_

Home address___

Home phone___

Cell phone___

Email address___

Occupation/Position  _Accountant_

Company___

Address  _Home office_

Business phone___

College/University  _PACE University_

PARENT/GUARDIAN

Name___

Relationship to applicant  _Father_

Home address  _SAME_

Home phone  _SAME_

Cell phone___

Email address___

Occupation/Position  _Chiropractor_

Company  _Self Employed_

Address___

Business phone___

College/University  _Sherman College of Chiropractic_

www.winstonprep.edu

facebook.com/winstonprepschool

@WinstonPrep

**New York**
126 West 17th Street
New York, NY 10011
646-638-2705
@WPSNY

**Connecticut**
57 West Rocks Road
Norwalk, CT 06851
203-229-0465
@WinstonPrepCT

**New Jersey**
901 Route 10 East
Whippany, NJ 07981
973-500-6480
@WinstonPrepNJ

**Transitions Program**
240 Madison Avenue, 14th fl.
New York, NY 10016
646-869-4600
@WPTransitions



**Winston Preparatory School**
*education for the individual*

Does the applicant live in a second household? *No*

HOUSEHOLD NO. 2

| PARENT/GUARDIAN | PARENT/GUARDIAN |
|---|---|
| Name_____ | Name_____ |
| Relationship to applicant_____ | Relationship to applicant_____ |
| Home address_____ | Home address_____ |
| _____ | _____ |
| Home phone_____ | Home phone_____ |
| Cell phone_____ | Cell phone_____ |
| Email address_____ | Email address_____ |
| Occupation/Position_____ | Occupation/Position_____ |
| Company_____ | Company_____ |
| Address_____ | Address_____ |
| Business phone_____ | Business phone_____ |
| College/University_____ | College/University_____ |

Name(s) of sibling(s) age(s), and current school(s) *— Age 14*
*Eleanor Roosevelt High School*

How did you hear about Winston Prep?

- ☑ Evaluator
- ☑ Advocate or attorney
- ☐ Consultant
- ☐ Friend or Family member
- ☐ School
- ☐ Internet
- ☐ Advertisement
- ☐ Other

Please elaborate: *Dr. Mukherjee (evaluator), Michelle Siegel (Educational Attorney)*

## 3. MEDICAL AND TREATMENT INFORMATION

1. Please list any allergies or health issues that require special attention.
   *None*

2. Please list all of your child's current prescribed medications and dosages.
   *None -*

3. Has your child been diagnosed with any medical or mental health conditions? Please explain.
   *ADHD*
   *Anxiety*

www.winstonprep.edu
facebook.com/winstonprepschool
@WinstonPrep

New York
126 West 17th Street
New York, NY 10011
646-638-2705
@WPSNY

Connecticut
57 West Rocks Road
Norwalk, CT 06851
203-229-0465
@WinstonPrepCT

New Jersey
901 Route 10 East
Whippany, NJ 07981
973-500-6480
@WinstonPrepNJ

Transitions Program
240 Madison Avenue, 14th fl.
New York, NY 10016
646-869-4600
@WPTransitions



**Winston Preparatory School**
*education for the individual*

## 4. OPEN HOUSE ATTENDANCE

Attendance to an Open House is mandatory for prospective parents/guardians. During an Open House, you will have the opportunity to hear more about our educational philosophy, tour the school, observe students and classes and participate in a question and answer session. Please review the enclosed schedule and register your attendance.

Parents/Guardians required Open House date ___11/13/18___

<small>Date of Open House attendance</small>

## 5. SIGNATURE

This application is a request for admission. This application for admissions becomes binding only when the student is evaluated, accepted, and you have delivered a fully signed Enrollment Agreement to Winston. Please complete, sign and return this form with the $100.00 application fee *and* a current photograph of your child.

_____  _____
Parent or Guardian name (please print)    Parent or Guardian Signature

___11/27/18___
Date

ADDITIONAL CONTACT(S): As signer of this application you are the primary point of contact for all admissions communication. If you wish to also designate your spouse or anyone else to receive direct communication, please indicate their names and contact information below.

Name:_____  Relationship:___Father___

Preferred email and/or phone:__

Name:_____  Relationship:_____

Preferred email and/or phone:_____

The Winston Preparatory School admits students of any race to all the rights, privileges, programs, and activities generally accorded to students at this school. The school does not discriminate on the basis of race, sex, religion, or national origins in the administration of education policies, athletic programs, financial aid, payment plans, and other school administered programs.

www.winstonprep.edu

facebook.com/winstonprepschool

@WinstonPrep

| New York | Connecticut | New Jersey | Transitions Program |
|---|---|---|---|
| 126 West 17th Street | 57 West Rocks Road | 901 Route 10 East | 240 Madison Avenue, 14th fl. |
| New York, NY 10011 | Norwalk, CT 06851 | Whippany, NJ 07981 | New York, NY 10016 |
| 646-638-2705 | 203-229-0465 | 973-500-6480 | 646-869-4600 |
| @WPSNY | @WinstonPrepCT | @WinstonPrepNJ | @WPTransitions |