**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RR AND WR, INDIVIDUALLY AND AS | : | |
| NEXT FRIENDS OF MR, | : | |
| | : | |
| Plaintiffs, | : | No. 3:21cv00873 (JCH) |
| v. | : | |
| | : | |
| GREENWICH BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | SEPTEMBER 12, 2022 |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant Greenwich Board of Education (the "Board") hereby submits this

memorandum in opposition to the motion for summary judgment filed by the Plaintiffs (ECF No.

41). For the reasons stated below, and the additional reasons stated in support of the Board's

cross-motion for summary judgment (ECF 39), the IHO's decision should be affirmed and

judgment should be entered for the Board.[1]

I.       **ARGUMENT**

In undertaking an analysis under the IDEA, courts proceed with an initial two-part review

that looks at both the procedural and substantive compliance with federal law. *See M.H. v. NYC*

*Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012). Here, the Plaintiffs challenge the decision of

the IHO on both procedural and substantive grounds.

---

[1] Unless otherwise noted, capitalized terms used in this brief have the meanings attributed to them in the Board's
memorandum of law filed in support of its motion for summary judgment (ECF No. 40).

## A.  Plaintiffs' Procedural Arguments.

As they did before the IHO, the Plaintiffs assert that the Board's failure to comply with procedural requirements of the IDEA have effectively deprived the Student of FAPE. This assertion is without merit.

### 1.  The Board had no obligation to have an IEP in place on the first day of classes.

Plaintiffs argue that the Student was entitled to have an IEP in place on the first day of classes at CMS, within two days (at most) of the family's move from New York to Connecticut. Plaintiffs cite no authority to support that the proposition that a student is entitled to an evaluation, determination of eligibility and implementation of an IEP all within two days of moving to a new state between school years. The statutory provision on which they rely does provide that a school district must have an IEP in effect "at the beginning of each school year," but that statute expressly applies only as to "each child with a disability in the agency's jurisdiction." 20 U.S.C. § 1414(d)(2)(A). As of the first day of classes, the Board had not yet identified the Student as a "child with a disability" within the meaning of 20 U.S.C. § 1401(3). That did not happen in this instance until the September 9, 2019 PPT.

The Student relocated from New York to Connecticut in August 2019. Plaintiffs admit that Student "transferred prior to the start of the 2019-2020 school year." (Pls.' Mem., ECF 41-1, at 12).[2] They further acknowledge the Board's responsibility to conduct a reasonable evaluation of the Student. (*See id.* at 15). In the case of an interstate transfer student, the Board is required to determine whether the student "has a disability and whether the most recent evaluation of the student conducted by the school district" in the previous state meets the requirements and

---

[2] Indeed, Plaintiffs insist upon this point, arguing that the regulation governing interstate transfers during the school year, 34 C.F.R. § 300.323(f), does not apply to this case. (*See* Pls.' Mem., ECF 41-1, at 11-12).The Board agrees that this regulation does not apply. (*See* Board's Mem., ECF 40, at 24-45.).

educational standards of Connecticut. *Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 648 (3d Cir. 2000). Thus, regardless of how the Plaintiffs themselves characterize the Student's disability,[3] the Board was obligated to make its own eligibility determination pursuant to Connecticut standards. Pursuant to clear federal law, "[a] … local educational agency shall conduct a full and individual initial evaluation … *before the initial provision of special education and related services* to a child with a disability under this subchapter." 20 U.S.C. § 1414(a)(1)(A). Until the Board determined that the Student was eligible pursuant to Connecticut law, the Student was not a "child with a disability" within the district's jurisdiction as defined in 20 U.S.C. §1414(a)(1)(A).

The law prescribes specific time requirements for evaluations to be completed. Federal regulations dictate that a district must undertake an initial evaluation within sixty days of receiving parental consent or within such shorter time period as a state may establish. *See* 34 C.F.R. § 300.301(c)(1)(i). Connecticut regulations provide that the IEP "shall be implemented within forty-five days of referral or notice." Reg. Conn. Agencies 10-76d-13(a)(1). Even when a district is on notice that a child within its jurisdiction is suspected of having a qualifying disability (the "child-find" obligation), the law still affords a "reasonable time" to evaluate a student. *Reg'l Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M.*, No. 3:07-CV-01484 (WWE), 2009 WL 2514064, at *8 (D. Conn. Aug. 7, 2009) (the local education agency must *evaluate* a student that is suspected of having a disability or as potentially requiring special education services "within a reasonable time after notice or suspicion of a disability"); *see also W.B. v. Matula*, 67

---

[3] Plaintiffs' non-exhaustive list includes "learning disabilities in reading comprehension and writing, ADHD-Combined Type, long-standing anxiety, long-standing difficulties at school with self regulation, organization, transitions, socio-emotional skills, and punctuality" for a student they describe as "sensitive, overly dependent, fearful of conflict … that may present as oppositional, may shutdown; and has difficulty reading social cues." (*See* Pls.' Mem., ECF 41-1, at 11).

F.3d 484, 501 (3d Cir. 1995) (neither federal "statutes nor regulations establish a deadline by which time children who are suspected of having a qualifying disability must be identified and evaluated," but courts have established that this must be done within a reasonable time after school officials are on notice of a potential disability), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch*., 486 F.3d 791 (3d Cir. 2007). The Board plainly met these requirements in this case. Classes started on August 29, 2019, which was within two days (at most) of the Student's move to Greenwich. The record demonstrates that by that first day CMS organized supports for the Student based on the NYC IEP and then developed and implemented a Greenwich IEP all within days.

Given the time afforded to a district to identify a transfer student as eligible and then to develop an IEP, the Plaintiffs' claim that the Board was on notice of the Student's disabilities as of mid-August (or at any point prior to Plaintiffs' move to Greenwich) is an irrelevant distraction. (*See* Pls.' Mem., ECF 41-1, at 11). A student must be within the school district's jurisdiction before the district assumes a duty to educate the student. The general rule in Connecticut is that the date and location of a child's residence determines when the school district becomes responsible for the child's education. *See* General Statutes § 10-220; *see also* general *Reg'l Sch. Dist. No. 11 v. State Bd. of Educ*., No. HHB-CV-21-6066176, 2022 WL 1978710, at *4 (Conn. Super. Ct. June 6, 2022) (School district where student resided with court appointed guardians became responsible for student's education once residency was established). The regulatory clock on the time that Board had to evaluate the Student or to schedule a referral PPT meeting did not start until the Student became a resident, which in this case happened on August 27, 2019 at the earliest. (2/24 Test. of Mrs. R., ECF 25-8, at 1224). There simply were not a sufficient number of school days between that day and the first day of classes to permit the

Board to evaluate the Student within the requirements discussed above or to convene a PPT meeting to develop an IEP following a determination of eligibility pursuant to 34 C.F.R. 300.323(c). *See Mr. & Mrs. B. v. Newtown Bd. of Educ.,* No. 3:06-CV-00217, 2008 WL 762179, at *3 (D. Conn. Mar. 20, 2008) (School's inability to complete an IEP by the first day of classes cannot be a procedural deficiency under the IDEA where there is not a sufficient number of school days between the referral request and the commencement of classes).[4] In addition, Connecticut regulations expressly provide that when, as here, a referral is made between school years, "the effective date of the referral may be deemed to be the first day of the next school year." Conn. Agencies Regs. § 10-76d-13(b).

In this case, as required, the Board provided written notice to Plaintiffs on August 29, 2019, two days *at most* after Student became a resident of Greenwich. The Board made its eligibility determination at the PPT meeting on September 9, 2019, within days[5] of the Student's move to Greenwich. The PPT requested and Mrs. R. agreed that the IEP would be implemented immediately. (2/24 Test. of Mrs. R., ECF 25-8, at 1240).[6] All told, the formulation and implementation an IEP for an out-of-state transfer student within days of the first day of classes and residency in the school district, as accomplished here, was well within the reasonable time afforded under Connecticut and federal law.

---

[4] Given the five-day notice requirement, the Board conducted the first PPT meeting at the earliest opportunity. Conn. Agencies Regs. 10-76d-12(a)(1). Plaintiffs' suggestion that the Board violated their procedural rights under the IDEA because it did not insist that the Plaintiffs waive their procedural rights under the IDEA is puzzling, to say the least. (*See* Pls.' Mem., ECF 41-1 at 15).

[5] The Plaintiffs' claim that there were seven school days between start of school and date of the September 9 PPT is not accurate. Accounting for Labor Day, there were five school days between the date of the notice (August 29) and the date of the PPT. (*See* Calendar, Pls.' Ex. 28, ECF 25-4, at 44).

[6] Under Connecticut regulations, absent Plaintiffs' consent the IEP could not have become effective until ten days following the Board's provision of written notice to the Plaintiffs of the Board's proposed IEP. Conn. Agencies Regs. § 10-76d-8(a)(5).

The Board's actions demonstrate faithful, immediate adherence to the spirit and letter of the law. It is plain that the Board determined eligibility and implemented an IEP in a timely manner consistent with the procedural requirements of the IDEA.

### 2. There is no evidence that the Board withheld a draft IEP or otherwise interfered with the Plaintiffs' ability to participate.

Plaintiffs' next procedural claim is that the Board violated their rights under the IDEA because the CMS team did not provide a draft of the Student's IEP three days before the July 2020 PPT meeting. (*See* Pls.' Mem., ECF 41-1 at 15). This claim is baseless.

Plaintiffs cite no legal authority to support an entitlement to a draft IEP three days in advance of a PPT meeting. The closest they get is a letter from the Connecticut State Department of Education concerning the continued provision of services during the COVID pandemic.[7] But that letter does not vest the Plaintiffs with any procedural rights in this case.

Even if the letter had the force of law Plaintiffs attribute to it, the Plaintiffs grossly overstate the suggestion made in the letter. Given the in-person restrictions occasioned by the pandemic, the letter encourages school districts to provide certain information three days in advance of PPT meetings (including draft IEPs) only if such information actual existed and it was possible to share it within that three-day timeframe. (*See* Letter, ECF 25-7 at 138). Here, there is no evidence that there was a draft IEP in advance of the July 2020 PPT, and it would be illogical to expect there would have been one since the very purpose of the July PPT was "to review and/or revise the [existing] IEP for the purpose of bridging to the high school." (July 2020 IEP, Board Ex. 15, ECF 25-6, at 77). Indeed the record clearly reflects that these circumstances were explained to the Parents at the July 2020 PPT meeting, where it was also

---

[7] Plaintiffs' memorandum refers to the letter as "Attachment A" (*see* Pls.' Mem., ECF 41-1, at 25), but there is no attachment to their brief.   Plaintiffs apparently intended to reference an exhibit to their brief to the IHO.  That attachment – the letter from the Connecticut DOE – appears in the Administrative Record, ECF 25-7, at 134-44.

noted that a new, revised IEP would be prepared for the upcoming annual review. (*Id.*)[8] Thus, ***there was no draft available*** to provide in advance of the PPT meeting on July 21, and even assuming the letter had the force of law, which it does not, there was no violation of the letter by the Board.[9]

Viewed in their broadest light, the Plaintiffs' complaints implicate their procedural right to participate in the development of an IEP. The IHO found that the Parents were "involved and informed" throughout the process. (*See* Final Decision, ECF 1-1, at 19). This finding is well supported by the record. The Parents received notice and were invited to each PPT. (*See* Board Ex. 9, ECF 25-6 at 17; Pls.' Ex. 5, ECF 25-2 at 94; Board Ex. 9, ECF 25-3 at 2; Board Ex. 3, ECF 25-5 at 60; Board Ex. 15, ECF 25-6 at 76; Board Ex. 17, ECF 25-7 at 36). Each notice complied with regulatory requirements by including general purpose of the meeting, attendees, date, time and location of meeting; and included the required provision of procedural safeguards at least annually. At least one parent attended all six of the PPTs. (Board Ex. 9, ECF 25-6, at 1; Pls.' Ex. 5, ECF 25-2, at 76; Board Ex. 9, ECF 25-3, at 2; Board Ex. 2, ECF 25-5, at 11; Board Ex. 15, ECF 25-6, at 76; Board Ex. 17, ECF 25-7, at 1).

Moreover, the IHO determined that nothing interfered with the Parents' ability to participate. (*Id.* at 19-20). The record reflects that the Parents were active participants in the team meetings and that the team sought parent feedback on the development of the Student's program. For example, the September 9, 2019 IEP shows that the Parent provided input and the input resulted in revisions to the goals and objectives initially proposed for discussion. (*See* Board Ex.

---

[8] Oddly, the Parents actually objected to the Student's annual review in August 2020 as "inappropriate," ostensibly since a PPT meeting had been held in July. (*See* August 2020 IEP, Board Ex. 17, ECF 25-7, at 2). Plaintiffs wisely do not pursue that claim here.

[9] At the hearing, the Student's mother acknowledged that the Board provided a draft IEP in advance of the Student's annual review – the annual meeting at which the PPT actually developed the Student's IEP for the upcoming school year. (2/24 Test. of Mrs. R., ECF 25-8, at 1167).

9, ECF 25-6, at 2). Similarly, the team convened a PPT on October 4, 2019, to seeking parent feedback on the school avoidance plan it had developed. (*See* 10/4/19 IEP, Board Ex. 7, ECF 25-5, at 76). As least objectively, the Student's mother committed to that plan. (*See id*. at 83). The Parents' objective involvement is further reflected in subsequent PPT meetings. (*See id.* at 76 ("Mr. Healy asked [Parents] to share their current concerns regarding Maya's transition to Central."); *see also* 11/1/2019 IEP, Pls.' Ex. 9, ECF 25-3, at 2 ("Mr. Healy asked [Parents] and their attorney if they would like to share any information .…")). IEP minutes also reflect input provided by the Parents. (*See, e.g.,* Board Ex. 15, 7/21/20 PPT, ECF 25-6, at 77 ("Mrs. R shared [Student's] strengths and challenges in the last year")).

The Board complied with its legal requirements to notify Plaintiffs of each PPT. Plaintiffs not only attended every PPT, but were objectively active participants. These findings are amply supported by the record, which as summarized above clearly establishes that the Parents had every opportunity to participate in the development of the Student's IEPs. The Plaintiffs' attempt to read in an inapplicable guidance letter as law, is simply another distraction that should be disregarded.

### 3.   Even if there was a defect in procedure, there was no denial of a FAPE.

A failure to receive a FAPE based on a procedural violation can be found only if the procedural inadequacies (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of education benefit." 34 C.F.R. § 300.513(a)(2); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii); *M.P.G. v. NYC Dep't of Ed.*, No. 08-CIV-8051, 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010). In this case, even if the Board was required to have an IEP in place on the first day of classes at CMS or required to provide a draft

IEP in advance of the July 2020 PPT, which it was not, the Plaintiffs have failed to demonstrate any of the factors that would support a finding that the Student was denied a FAPE.

**B. The Board Provided a FAPE In The Least Restrictive Environment.**

As to their substantive arguments, Plaintiffs' motion ignores two essential aspects of the IDEA. First, the IDEA does not mandate the development of IEPs that "maximize the potential of handicapped children." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 189 (1982). A district fulfills its substantive obligations under the IDEA if it provides an IEP that is "likely to produce progress, not regression," and that "affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 254 (2d Cir. 2009) (citation and internal quotation marks omitted). The IDEA only provides for an "appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 132 (2d Cir.1998) (citation and internal quotation marks omitted). Thus, an IEP is substantively appropriate if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207. The IHO's findings as to FAPE are supported by the record and should be affirmed.

The second principle absent from the Plaintiffs' argument is any recognition of the appropriate deference owed to the IHO and the professional educators involved in the Student's education. This is particularly important when considering the substantive adequacy of an IEP. As the Second Circuit has held, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir. 2005).

In this case, the hearing testimony establishes that the CMS educators demonstrated a thorough understanding of the Student's needs and the effectiveness of the IEP programming in meeting those needs. Ms. Baumeister is an experienced special education teacher with training, knowledge and experience in assessing student needs, designing individualized programs to meet those needs, and effectively implementing special education services. (11/9 Test. of J. Baumeister, ECF 25-8, at 11; Resume of J. Baumeister, ECF 25-7, at 38). The Student's science teacher, Jesse Outhouse, adapted instructional strategies, collaborated with team, including the school psychologist, to support the Student's engagement and learning. (9/16 Test of J. Outhouse, ECF 38, at 69-70; 12/10 Test of T. Healy, ECF 25-8, at 516). Catherine Napoletano is an experienced school psychologist who regularly administers assessments and interprets the results of assessments to support the PPT in the development and implementation of appropriate individualized programs.  (Resume of C. Napoletano, ECF 25-7, at 42-43; Final Decision, ECF 1-1, at 5-6). As established at the hearing, the student's educational team met regularly to discuss student, determining effective instructional strategies to support her learning. (Final Decision, ECF 1-1, at 5-6). Plaintiffs simply ignore the wealth of experience and effort that was brought to bear to establish a program that was more than sufficient to allow the Student to make educational progress.

   1.   **IEP for the 2019-2020 School Year.**

The IHO found that the IEP for the 2019-2020 school year was substantively appropriate. In reaching this conclusion, the IHO found that the CMS team appropriately started with the information it had (i.e. the expired NYC IEP and the accompanying report from Dr. Mukherjee from April 2018) and developed specific strategies, goals and accommodations to address the Student's needs. (*See* Final Decision, ECF 1-1, at 5 (¶ 23)). The CMS team then developed an

IEP for the Student that incorporated goals and objectives from the NYC IEP and detailed the
services that would be utilized at CMS to achieve those goals and objectives. (*See id.* at 5 (¶ 28)).

      While the IHO's findings of appropriateness are amply supported by the record (the
September 9 IEP itself provides more than sufficient evidentiary support)[10] on appeal the
Plaintiffs disagree with the IHO's conclusions as to the appropriateness of the IEP based on
several arguments that simply do not withstand analysis.

      a)      **The IEP was appropriately tailored to the Student's educational
needs.**

      The IHO went to some length to explain the views and contributions of the professionals
that went into the formulation of the IEP (*see id.* at 5-6 (¶¶ 26-38)), and made specific findings
as to the goals that were to be implemented via the Greenwich IEP as well as the many
accommodations that were put in place to further assist the Student, (*id.* at ¶¶ 40-54 and
particularly ¶ 44 (listing examples of accommodations)). The IEP also incorporated the input of
the special education teacher at CMS who had been working directly with the Student. That
teacher, Ms. Baumeister, concluded that the Student's language arts (reading and writing)
abilities were consistent with grade-level expectations. (11/9 Test. of J. Baumeister, ECF 25-8 at
42).  This conclusion was supported by the objective evidence that – just days later – the Student
performed well on standardized English assessments. (*Id.* at 41-42). CMS also administered
standardized assessments in math, and the Student's results (below grade level) confirmed the
accuracy and appropriateness of the PPT's observations and IEP recommendations. *Id.*

---

[10] The September 9 IEP identified goals (ECF 25-6 at 2) and developed measurable progression tracking and
evaluation criteria for said goals. (*Id* at 8-10). The goals and objectives were "based on [Student's] prior IEP from
New York and a neuropsychologist report included with her records" and updated based on her "performance in
academic classes." (*Id.*)

The documentary information made available to the Board prior to the 2019-2020 school year showed that the Student possessed average intellectual functioning. (*See* Board Ex. 12, ECF 25-6, at 40, 51).  Moreover, that information indicated that the Student had met grade-level standards – without the implementation of an IEP – in 6th and 7th grades, with the sole exception of math. (NYC IEP, Board Ex. 11, ECF 25-6, at 21). The NYC IEP did not indicate that the Student needed to be placed in a segregated setting for content area (academic) subjects in order to learn. (*Id*. at 29). Further, the Student had made gains in her academic skills since the spring 2018 neuropsychological evaluation; as reflected in the Fusion Report, the Student had earned As in English, science and social students and was achieving Bs in math. (*See* Fusion Transcript for 2018-2019, Board Ex. 10, ECF 25-6, at 19).

The Board individualized the Student's plan based on the information provided by Plaintiffs and its teachers' own independent observations. Consistent with that information, the Greenwich IEP noted that, in English Language Arts (ELA), the Student performs commensurate with grade-level expectations. (Board Ex. 9, ECF 26-6, at 5). This was consistent with Dr. Mukherjee's spring 2018 evaluation. (*See* Board Ex. 12, ECF 26-6, at 51 (reporting that the Student possessed strong vocabulary skills (84th percentile)); *id.* at 52 (noting strong reading fluency (98th percentile) and strong comprehension skills (70th percentile))).[11]

In math, the Greenwich IEP notes that the student performs "slightly below grade level" with errors in calculations and multi-step problem solving. (*Id*.) Despite the Fusion Transcript,

---

[11] The Student's experienced special education teacher observed the Student's performance in the English skills class (segregated special education class) and observed Student's grade-level skills in English. (11/9 Test. of J. Baumeister, ECF 25-8, at 28-30, 36). Importantly, that observation was confirmed mere days later when the Student scored in the above average range on a standardized English assessment administered at CMS. (Pls. Ex. 4, ECF 25-2, at 73). Yet, to ensure for student's success, a special education teacher and para provided support within the ELA class. (*See* 10/8 Test. of J. Baumeister, ECF 38, at 281; 11/9 Test. of J. Baumeister, ECF 25-8, at 32-33). The teams' assessment as to math was also confirmed on the STAR math assessment, on which the Student scored "roughly two grades below grade level." (Board Ex. 15, ECF 25-6 at 81).

this observation was consistent with the NYC IEP, which reported that the student did not meet grade-level expectations in math (F in math in spring 2018). (*See* NYC IEP, Board Ex. 11, ECF 25-6, at 21-22). This information and the CMS team's experience with the student in math skills class confirmed that that setting – a specialized support setting within CMS – was appropriate.[12] In contrast, the Student's performance in ELA was grade level (actually, higher than grade level) and suggested that Student should access general education.

The Greenwich IEP also notes the Student's need for support in initiating tasks, organizing and planning. Finally, the IEP identified concerns with self-regulation and socio-emotional skills during peer interactions. (*Id*. at 6). As stated in the minutes of the IEP (ECF 25-6, at 2), the special education teacher and school psychologist proposed draft goals and objectives to target the Student's skill development in these areas. (*Id*.).

The record further demonstrates that, in formulating the IEP, the CMS team revised the proposed goals in light of the team discussion, recommending goals and objectives to target math skills (multi-step problems, word problems), executive functioning and organizational skills, and self-regulation and socio-emotional skills. (*Id*.). Additionally, the team reviewed the numerous accommodations and supports, through academic lab and counseling, that would support the Student's learning. (*Id*.) Mr. Healy, the assistant principal, reviewed the recommendation, and the IEP minutes note that all members of the team, including the Student's mother, were in agreement. (*Id*. at 1). To claim as Plaintiffs do here that this effort did not produce an individualized IEP requires one to ignore the IHO's conclusions and the solid evidentiary record upon which those conclusions are based. (*See* Pls.' Mem., ECF 41-1, at 19).

---

[12] The Student's need for specialized instruction outside of the general education classroom for math similarly was confirmed by the neuropsychological evaluation provided to the PPT. The Student's arithmetic performance was in the 5th percentile (*see* Board Ex. 12, 25-6, at 51) and quantitative reasoning was below average (*id.* at 42).

The September 9, 2019 IEP appropriately recommended the Student's placement in general education (with the exception of the Student's math class) with specialized supports and services. In any event, Plaintiffs' concerns regarding class size and instructional programming are matters of educational policy, better suited to resolution by a state educational administrative officer rather than the courts. *See Rowley,* 458 U.S. at 206, (independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003) (A court may not "cho[ose] between the views of conflicting experts on a controversial issue of educational policy ... in direct contradiction of the opinions of state administrative officers who had heard the same evidence.").

### b)      The Board was not obligated to implement the expired NYC IEP.

The Plaintiffs appear to claim that the Greenwich IEP was deficient because it did not implement the NYC IEP. (*See* ECF 41-1, at 16, 18-19). This is true in the sense that the Board developed its own IEP based on the Student's current functioning (not exclusively based on her functioning as of August 2018),[13] but the claim is as misleading as it is irrelevant. As discussed above, the NYC IEP provided information and data the CMS team considered and evaluated, but the Board had no obligation to implement an expired IEP.

The claim is misleading because the Plaintiffs misrepresent what the NYC IEP says. Plaintiffs claim the "NYC [PPT] rejected a general education plan" for Student (Pls.' Mem., ECF 41-1, at 14) and that the "New York IEP clearly stated the co-taught classes were not effective for the Student." (*Id*. at 18). These statements simply are not true. The NYC IEP explicitly states Student "will continue to be exposed to the general education curriculum with the support of an

---

[13] The NYC IEP provided to CMS was developed at an IEP meeting held over a year before on August 6, 2018. (*See* Board Ex. 11, ECF 25-6, at 33).

integrated co teaching program with special education teacher support services with counseling to address her academic and social emotional delays." (Board Ex. 11, ECF 25-6, at 24). The expired IEP further confirmed the Student's placement by indicating "General Education Classroom" for all content areas. (*Id*. at 29). It recommended integrating special education teacher support services on a "pull out & push in" basis in a separation location[14] five times per week. (*Id*.) In sum, the NYC IEP did not reject general education placement nor did it find co-taught classes to be ineffective – in fact it recommended both.[15]

Moreover, well over a full year had passed since the development of the NYC IEP before the Student's seventh-grade year (2018-2019), and the Student had been highly successful in her seventh-grade program. (*See* Fusion Report Academic Year 2018-2019, Board Ex. 10, ECF 25-6, at 19). By the summer of 2019, the CMS team was presented with a student whose academic skills were solidly intact, with the exception of mild deficits in the area of mathematics. (9/9/19 IEP, Board Ex. 9, ECF 25-6 at 2, 5). The CMS team reviewed all the information available for the September 9 IEP -- the spring 2018 evaluation report, the Fusion transcript, the NYC IEP, the Student's performance at CMS in specialized and general education settings – and concluded (just as the special educators in NYC had concluded) that the Student, who possessed average intellectual abilities, could learn alongside her typical peers in general education settings. (*See id*. at 15).

Second, Plaintiffs patently erroneous claims about the contents of the NYC IEP are irrelevant in any event because that IEP had by its terms expired even before the Student moved

---

[14] Separate locations outside of the General Education Classroom were only recommended exclusively for Group and Individual Counseling Services.

[15] The NYC IEP recommended integrating special education support within the general classes through integrated co-teaching. (Board Ex. 11, ECF 25-6, at 24). Co-taught classes are "general education" classes. (*Id*. at 29). Thus, the NYC IEP recommends placement entirely within general education for all core subject areas.

to Greenwich. While, as the IHO found, CMS had moved expeditiously to implement a program based on the NYC IEP for the first day of classes at CMS, it should be recalled that no services were legally owed under that IEP for a host of reasons (*see* Board's Mem., ECF 40, at 21-26), not the least of which was that it was no longer operative.

Plaintiffs assert that that Board's efforts to base its program for the Student on the NYC IEP are irrelevant because 34 C.F.R. § 300.323 – the regulation that provides for comparable services in the event of an interstate transfer during the school year – does not apply in this case because the Student did not transfer during the school year. (*See* Pls.' Br., ECF 41-4, at 16). The Board agrees. (*See* Board's Br., ECF 40, at 24-25). As the Board argues in support of its motion for summary judgment, it owed the Student no legal obligation (under that regulation or otherwise) to provide comparable services prior to making its own eligibility determination under the IDEA. (*See* Board's Mem., ECF 40 at 22-24). The fact that it chose to provide services comparable to those services identified in the expired NYC IEP demonstrates the reasonableness of the Board's conduct in this instance and, ultimately, its commitment to providing the Student with a FAPE.

In that regard, Plaintiffs' criticisms of the Board's IEP based on the NYC IEP fall short for a more practical reason: the NYC IEP was *never* implemented, as the Student attended Fusion for her seventh-grade year. Thus, Plaintiffs' overarching complaint that they were concerned that the "Student was receiving less support from the Board than the Student received with the New York IEP" ultimately just rings hollow. (Pls.' Mem., ECF 41-1, at 19).

### c)    The Board Considered Plaintiffs' Private Evaluation.

Plaintiffs further claim that the IHO erred in failing to credit the recommendations of Dr. Riordan over the Board's program and the testimony of the Board's professionals at the hearing.

This claim has no merit. First, Dr. Riordan's evaluation and report were not completed until *after* the Parents' unilateral placement of the Student at Winston Prep. (*See* Pls.' Ex. 7, ECF 25-2, at 98 (report); Pls.' Ex. 6, ECF 25-2, at 96-97 (Oct. 11, 2019 notice of placement)). It is axiomatic that a substantively appropriate IEP cannot be rendered inadequate by an expert report that was not submitted to the team that developed the IEP. *See DAP v. NYC Dep't of Ed.*, 973 F. Supp. 2d 344, 361-62 (S.D.N.Y. 2013).

Next, while Plaintiffs repeatedly claim that the Greenwich IEPs were "inconsistent" with Dr. Riordan's recommendations, *see, e.g.,* Pls.' Mem., 41-1, at 24 ("The IEP was inconsistent with Dr. Riordan's evaluation report and recommendations."), the only detail Plaintiffs' offer to support this claim is Dr. Riordan's recommended placement at Winston Prep. (*E.g., id.* at 22, 23).

Thus, the dispute regarding Dr. Riordan's recommendation, viewed in its proper light, is a difference of opinion as to placement only. In that regard, it is noteworthy that Dr. Riordan's report is remarkably selective, reaching back to an evaluation that was never provided to the PPT (but was provided to Dr. Riordan and Winston Prep) concerning the Student's "first evaluation in 5th grade" and ignoring the NYC IEP and the Greenwich IEP, both of which, contrary to that stale evaluation, placed the Student in a general education setting with proper supports. (*See* Pls.' Ex. 7, ECF 25-2, at 115). It is also telling that, according to Dr. Riordan, the "most important[]" aspect of the Student's placement is that the Student "needs to feel successful at school." (*Id.*). The Board's program would have engendered this feeling of success but, as the IHO expressly found, the Parents thwarted the Board's ability to implement it.

Moreover, even if Dr. Riordan's report was persuasive and consistent with the evidence of record, the IDEA does not mandate that a district must adopt the recommendations made in an

evaluation. Rather, the IDEA's implementing regulations require that an independent evaluation must be considered – not adopted – when developing an IEP. *See* 34 C.F.R. § 300.502(c)(1); *see also S.W. v. New York Dept. of Educ.*, 92 F. Supp. 3d 143, 161 (S.D.N.Y. 2015). The record demonstrates that the PPT did just that.  Based on the information presented by Dr. Riordan and Winston Prep teachers, the PPT revised the Student's IEP. (*See* Jan. 2020 IEP, Board Ex. 2, ECF 25-5, at 12).  The PPT considered, but did not agree, with Dr. Riordan's foregone conclusion that the Student's placement should be at Winston Prep. Rather, the educators who worked with the Student at CMS saw, first hand, that the student could learn alongside her typical peers.[16]

The Board is "not required to give [an] independent evaluation any particular weight or afford any deference to its recommendations" *J.S. v. NYC Dep't of Educ.*, 104 F. Supp. 3d 392, 404 n.3 (S.D.N.Y. 2015) *aff'd*, 648 F. App'x 96 (2d Cir. 2016). Indeed, it is well-established that this Court should defer to the Board, not to a private expert. *See G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *19 (S.D.N.Y. Mar. 29, 2013) ("The Court is not at liberty to favor [the] opinion [of] a privately hired expert[] over the deference that should appropriately be accorded to the [d]istrict in matters of educational policy."), *aff'd*, 554 F. App'x 56 (2d Cir. 2014); *McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-CV-6207, 2013 WL 237846, at *10 (S.D.N.Y. Jan. 22, 2013) (rejecting argument that "the [IHO] erred by relying too heavily on the evaluations and opinions of the [d]istrict's witnesses while giving little or no weight to the conclusions of [the] [p]arent's experts" because the court defers to the district, not to a private expert); *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010) ("The mere fact that a separately hired expert has recommended different programming

---

[16] This conclusion is also supported by the observation conducted by Dr. Riordan's colleague at CMS. (Pls.' Ex. 7, ECF 25-2, at 101-02).

does nothing to change the deference to the district and its trained educators." (cleaned up), *aff'd*, 487 F. App'x 619 (2d Cir. 2012)).

There is no claim in this case that the Board did not consider Dr. Riordan's report and, given that the reason for the January 2020 PPT was for that express purpose, any such claim would be specious. (*See* January IEP, Board Ex. 2, ECF 25-5, at 12). Thus, the Board complied with its obligation under 34 C.F.R. § 300.502(c)(1) and Plaintiffs' attempt to reverse the IHO for failing to adopt the placement recommendation of Dr. Riordan must fail.

### d)    The IHO's findings regarding implementation of the Greenwich IEP are supported by the Record.

The record supports the IHO's finding that the initial IEP was appropriate: it provided a program appropriate for the Student's needs and also provided accommodations, strategies and tools to help the Student cope with her organizational issues. (*See* Final Decision, ECF 1-1, at 20).

The practical issue facing the Board, upon which rest the Plaintiffs' present argument that CMS did not sufficiently address the Student's anxiety, was the Student's frequent absences and tardiness following the September 9 PPT. (*See id.*). As the IHO expressly found, "Student was absent or tardy with increasing and alarming frequency." (*Id.*). Plaintiffs claim that this is dispositive evidence that the program was not sufficient, but such a claim is soundly refuted by the objective record.

As the IHO found, the Student's attendance at school was "essential to her success in school." (Final Decision, ECF 1-1, at 20). When attendance became an issue, CMS quickly adapted to and addressed the Student's absences and tardiness with the School Avoidance Plan. It designed that plan and obtained both the Student's and the Parents' ostensible buy-in and commitment at the October 4 PPT meeting. (10/4 IEP, Board Ex. 7, ECF 25-5, at 67). But as of

that date, Winston Prep had already accepted the Student. (2/24 Test. of Mrs. R., ECF 25-8, at 1157). While the IHO did not expressly make a finding, it is more likely than not that the Student's October 29 start date at Winston Prep was arrived at after determining the practical and legal necessity of providing the Board with sufficient notice of the Parents' unilateral placement from the time of the October 11, 2019 letter from Plaintiffs' counsel. (*See* Pls.' Ex. 6, ECF 25-2, at 96-97 (October 11, 2019 letter from counsel)). In any event, it is telling that after the PPT on October 4, 2019, the Student attended only two full days of school at CMS before her first day at Winston Prep on October 29, 2019. (*See* Calendar, Pls.' Ex. 28, ECF 25-4, at 44; Attendance Report, Board Ex. 1, ECF 25-5, at 8-9).

Plaintiffs claim that the Student stopped attending school because the Board's program failed, but that claim finds no support in the record (much less sufficient grounds to overturn the IHO's findings to the contrary). The Student's issue with getting to school on time was largely related to the need for consistent home routines and, thus, was an issue entirely within the Plaintiffs' control. The information initially provided to the CMS team was that any school attendance issue was related to a peer conflict from well over a year before at a prior private school and, thus, would not have been anticipated to continue in a new setting. (*See* Board Ex. 12, ECF 25-6 at 38-39).[17] When attendance issues did present at CMS, the CMS team developed a plan to support the Student, worked to collaborate with the family, offered community-based supports, and even tried to make home visits. (*See* 10/4 IEP, Board Ex. 7, ECF 25-8, at 83). This was not a deficiency in any learning supports provided by the Student's IEP. In fact, the CMS team correctly identified the issue at that time: the student needed a different nighttime and

---

[17] Similarly, the NYC IEP does not evidence significant emotional struggles. (Board Ex. 11, ECF 25-6, at 21-27.)

morning routine at home.[18] Plaintiffs' own expert (Dr. Riordan) confirmed that the issue with school attendance was not about her education program but, rather, related to routines and the Student's need to use routines, such as making lunch the night before school, to support the student's attendance. (*See* Riordan Test., ECF 25-8, at 341-42).

To the extent the Plaintiffs claim that the Board did not provide a FAPE because the IEP was not implemented, the Parents thwarted the Board's attempt to educate the Student, as the IHO found. The Student's attendance dropped once the Parents applied for immediately placement at Winston Prep. While on the surface, the Plaintiffs agreed to follow the team's plan, they chose not to bring Student to school on multiple days. (*See* 2/19 Test. of Mrs. R., ECF 25-8, at 1150, 1153, 1155, 1276; *see also* Board Ex. 1, ECF 25-5, at 8-10 (Student's attendance history while enrolled at CMS)). It is understandable that the Student would disengage from CMS once she learned that she was moving to a different school (the fourth in three years). And, contrary to Plaintiffs' claims, the situation was no different when the Student began at Winston Prep. (*See* 11/17 Test. of J. Yanotti, ECF 25-8 at 380-381; *see also* 2/24 Test. of Mrs. R., ECF 25-8 at 1175; 10/8 Test. of J. Yanotti, ECF 38 at 380). Indeed, as the IHO found, the Student encountered similar avoidance problems when she began at Winston Prep, and those circumstances improved gradually over several months. (*See* Final Decision, ECF 1-1 at ¶¶ 174-77; 180).[19] The difference with Winston Prep, however, was that the Plaintiffs gave that placement a chance, while, as the IHO found, they did not give the Board's program a chance to succeed.

---

[18] The CMS special education teacher, Ms. Baumeister, testified that the Student's mother reportedly had a difficult time getting the Student out of the house in the morning. (Test. of J. Baumeister, ECF 25-8, at 49). The CMS psychologist testified that the issue was one of needing a home routine for the morning. (12/10 Test. of C. Napoletano, ECF 25-8, at 426) ([s]he did not have a routine that I know of for the morning time"). The team's conclusion that attendance issues were related to the Student's need for support in the home

[19] Even Dr. Riordan admitted that the Student's difficulties continued at Winston Prep. (*See* Riordan Test., ECF 25-8, at 332). Such difficulties are not surprising for a student described as having difficulty with transitions being placed in a different school for each of three successive years.

### 2.  IEP for the 2020-2021 School Year.

Apart from their procedural arguments, which have no merit for the reasons stated above and in the Board's motion for summary judgment, Plaintiffs' attack on the IHO's findings as to the IEP developed for the 2020-2021 school year appears to be founded on the belief that the IEP for the 2020-2021 school year fails because the IEP for the 2019-2020 school year did not provide a FAPE. (*See* Pls.' Mem., ECF 41-1, at 20-22).

First and most basic, the IHO's conclusion that Greenwich IEP did provide the Student with a FAPE for the 2019-2020 year is correct for the reasons demonstrated above. The IHO squarely rejected the Plaintiffs' claims that the Student's performance was somehow inadequate due to the design of the Student's IEP. Rather, the IHO concluded that the Student's performance was affected by absences from school that grew in alarming frequency once the Plaintiffs requested, and the Student was accepted for, immediately placement at Winston Prep. As the IHO found, the Student's performance was adversely affected because the Parents did not give the Board's program any chance to succeed. (*See* Final Decision, ECF 1-1, at 21).

Second, under the circumstances, the mere fact that a later IEP is based on an earlier IEP does not render the later IEP invalid or even suspect. Similarity between IEPs is not a sufficient basis to find an IEP substantively deficient. *See B.M. v. Pleasantville Union Free Sch. Dist.*, No. 20-CV-2192 (KMK), 2021 WL 4392281, at *16 (S.D.N.Y. Sept. 24, 2021); *AR v. Katonah Lewisboro Union Free Sch. Dist.*, No. 18-CV-9938, 2019 WL 6251196, at *13 (S.D.N.Y. Nov. 21, 2019); *see also P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 414 (S.D.N.Y. 2017) ("An IEP is not inappropriate, however, simply because it does not change significantly on an annual basis.") (citation and quotation marks omitted). Rather, "[t]o the extent there is some similarity between goals from year to year, such continuity makes sense. Modeling an IEP after the prior year's IEP, with appropriate changes, is a sensible practice that, as long as it is not done

22

reflexively and without consideration of the student's individual circumstances and needs, does not signify that the student is likely to regress." *J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL 3975942, at *12 (S.D.N.Y. Aug. 5, 2013).

### 3. Plaintiffs ignore the requirement that placement be in the least restrictive environment.

The Plaintiffs' argument also studiously ignores the import of the requirement that a child with a disability be educated in the "least restrictive setting consistent with [her] needs," *M.H.*, 685 F.3d at 224 (citation omitted). Instead, they suggest that the IHO found that Winston Prep was an inappropriate placement because it in fact was not the least restrictive environment. (*See* Pls.' Mem., ECF 41-1, at 20 (quoting Final Decision at 20)). While that it is not at all what the IHO found, the concept of least restrictive environment is crucial to the resolution of this appeal.[20]

While a parental placement is not *per se* inappropriate because it is not in the least restrictive environment, "it is nonetheless proper for a court to consider the restrictiveness of the private placement as a factor when determining the appropriateness of the placement." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014) (internal quotation marks omitted). The restrictiveness of the parents' placement may be relevant "in considering whether a private placement would be more restrictive than necessary to meet the child's needs." *Id*. at 837. This is the issue here.

The least restrictive environment (LRE) requirement means that, "to the maximum extent appropriate," the student will be educated "with other students who do not have handicapping conditions." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 (2d Cir. 2007); *see*

---

[20] The IHO expressly did not reach the issue of the appropriateness of the placement at Winston Prep. (*See* Final Decision, ECF 1-1, at 21).

*also P.C.*, 232 F. Supp. 3d at 408 ("[B]ecause the IDEA views private school as a last resort[,] a child may only be removed into a more restrictive environment when the nature and severity of her disability is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved." (cleaned up); *M.B. v. N.Y.C. Dep't of Educ.*, No. 14 CV 3455-LTS, 2017 WL 384352, at *7 (S.D.N.Y. Jan. 25, 2017)  ("Courts in this Circuit have uniformly held that the [PPT] is not required to consider non-public placements after it determines that a public placement is available that has the ability to implement the [IEP]."); *GB v. NYC Dep't of Educ.*, 145 F. Supp. 3d 230, 241 (S.D.N.Y. 2015) (observing that a private school "is the most restrictive placement"). The purpose of LRE is to ensure that students with disabilities learn alongside – and are not segregated from--  their typical peers to the maximum extent appropriate for each such student

Here, the Student's IEPs meet that obligation.  The IEP provided for placement in general education classes, with specialized learning supports.  Student was removed from general education content areas classes only for math based on objective evidence that showed that the Student could not access the math curriculum in the general education class even with supplementary supports. Both the NY team and the Greenwich PPT members – administrators, general educators, special educators, and school psychologists – reviewed the Student's functioning and concluded that the Student would benefit from placement in general education classrooms with the supplementary provision of specialized supports.  This is precisely what Congress intended:  students with disabilities who can learn in general education classrooms **must** be recommended for such settings.

The IHO's conclusion that general education setting is the appropriate placement for the Student was confirmed even by the observation conduction in 2019 by Dr. Riordan's colleague

as part of the parent-procured evaluation. That evidence shows that the Student benefitted from general education classes, such as her science class. (*See* Assessment, Pls.' Ex. 7, ECF 25-2, at 101-02). The observation conducted demonstrated that the student was engaged, conferring with her teacher, and completing assignments. (*Id*.). Moreover, Mr. Outhouse, the Student's science teacher, described his interaction with the Student as a breakthrough in terms of her response to the instructional strategies and their development of a fledgling educational relationship.[21] (9/16 Test. of J. Outhouse, ECF 38, at 148-49). He explained that he was so excited about the breakthrough that he went straight to the school psychologist's office to inform her, and he expressed his own disappointment when then Student never returned to his class after that observation. (*See id*). Thus, the record provides ample support for the notion that the Student can learn commensurate with her peers, with the exception of math.

Here, the CMS team determined that it had the ability to implement a general education placement of the Student, which incidentally was also the conclusion of the NYC IEP. That being the case, the placement at CMS was the least restrictive placement and the most appropriate placement under clearly established law. The IHO's decision is well reasoned and supported by the administrative record. It also appropriately takes into account the IDEA'S "strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Walczak,* 142 F.3d at 122 (internal citation and quotation marks omitted). It is appropriate that this Court defer to the IHO on this issue. *See R.E. v. New York City Dep't of Educ*., 694 F.3d 167, 189 (2d Cir. 2012) ("[A] court

---

[21] Dr. Riordan recommended in her report that it was "critical that [Student] develop a relationship with an educator in the school building with whom she can establish a close and productive working relationship." (Board Ex. 8, ECF 25-5, at 104). This appears to be the foundation for exactly the type of student-teacher relationship that Dr. Riordan identified as critical to the Student's success.

must defer to the [IHO's] decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned ….").

### C. Equitable Considerations Warrant Denial of Any Relief.

Even if this Court overturns the IHO's determination that the Board's programs provided the Student with a FAPE, equitable considerations prevent an award in the Plaintiffs' favor for their unilateral placement. The IHO found that the Parents thwarted the Board's efforts to provide a FAPE to the Student. (*See* Final Decision, ECF 1-1, at 21). That finding is supported by the record and, under such circumstances, granting the Plaintiffs relief would be inappropriate.

Plaintiffs argue that the Board excluded the Parents from the IEP development process (Pls.' Mem., ECF 41-1, at 16), however the record shows that Plaintiffs predetermined that the Student would be educated in a private setting instead of CMS. The evidence supports the IHO's finding that Parents "peremptorily removed the student from the school" (Final Decision, ECF 1-1, at 20), and the Board's position that Plaintiffs' participation in the special education planning and implementation process was illusory.

The IDEA provides that reimbursement for private schooling "may be reduced or denied ... upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III). Courts may "deny reimbursement if a parent's own actions frustrated the school's efforts" to provide FAPE or if the parents "otherwise act unreasonably". *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1312-13 (11th Cir. 2003). Ultimately, "[P]arents who unilaterally change their child's placement ... without the consent of state or local school officials, do so at their own financial risk." *A.S. ex rel. P.B.S. v. Bd. of Educ. of Town of W. Hartford*, 245 F. Supp. 2d 417, 426 (D. Conn. 2001), *aff'd sub nom.* A.S. ex rel. P.B.S. v. Bd. of Educ. for Town of W. Hartford, 47 F. App'x 615 (2d Cir. 2002). The record

26

clearly supports that Parents' transfer was made "truly unilaterally, bereft of any attempt to achieve a negotiated compromise" for Student's special education supports, IEP, or private placement. *Town of Burlington v. Dep't of Educ. for Com. of Mass.*, 736 F.2d 773, 799 (1st Cir. 1984), *aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985). Plaintiffs chose to remove Student from CMS without meaningfully participating in Student's education planning.

The Plaintiffs' actions are best demonstrated in the obstruction of the SAP. Their actions were clear: Student attendance at CMS (and thus Student success at CMS) were not a priority. Rather, Winston Prep the priority. In that regard, the Parents feigned agreement in working towards effecting the IEP at CMS, yet they scheduled Winston Prep evaluation sessions (2/19 Test. of Mrs. R., ECF 25-8, at 1276), school visits (*id*, at 1150), and shadow days (*id.* at 1153, 1155) during the school days interrupting any chance at consistency and success of school attendance efforts. (*See* Final Decision, ECF 1-1 at 22). Student reported to CMS faculty that the she was not complaining about school; yet the Parents would misinterpret Student's experiences in an effort to create a record. (Final Decision, ECF 1-1 at 11; *see* 11/9 Test. of J. Baumeister, ECF 25-8, at 65-66; *see also* 1/19 Test. of T. Healy, ECF 25-8, at 707-09; Test of M. Davis, ECF 25-8, at 738-39). At the October 4 PPT, the team discussed introducing a private therapist to Student's routine (Board Ex. 7, ECF 25-5, at 67), however Plaintiffs failed to act on that before removing Student from CMS. (2/19 Test. of Mrs. R., ECF 25-8, at 1270).

The IHO correctly found that the "Parents made the decision for unilateral placement without giving the Board a reasonable chance to implement its plan for the Student." (Final Decision, ECF 1-1, at 21). The effect of the Parents' actions in that regard was to obstruct the implementation of an appropriate IEP and require public funding of their preferred placement.

The IDEA provides protections – a shield – that when followed lead to the development of an appropriate IEP. The IDEA cannot be allowed to be used as a sword where, as here, those protections are followed.

## II.    CONCLUSION

For all the reasons discussed above, the Board respectfully requests that the Plaintiffs' motion be denied and judgment be entered in favor of the Board.

DEFENDANT,
GREENWICH BOARD OF EDUCATION,

By: /s/ Patrick M. Fahey
    Patrick M. Fahey (ct13862)
    Andreana R. Bellach (ct21302)
    SHIPMAN & GOODWIN LLP
    One Constitution Plaza
    Hartford, CT 16013
    Tel.: (860) 251-5000
    Fax: (860) 251-5219
    pfahey@goodwin.com
    abellach@goodwin.com

    Abby R. Wadler (ct28051)
    Town Hall, Law Department
    101 Field Point Road, P.O. Box 2540
    Greenwich, CT 06836-2540
    Tel.: (203) 622-7876
    Fax.: (203) 622-3816
    abby.wadler@greenwichct.org

    Its Attorneys

SG 11468140v.5