## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| R.R. AND W.R., INDIVIDUALLY AND AS | : | |
| NEXT FRIENDS OF M.R., | : | CIVIL CASE NO. |
|     Plaintiffs, | : | 3:21-CV-00873 (JCH) |
| | : | |
| v. | : | |
| | : | |
| GREENWICH BOARD OF EDUC. | : | May 30, 2023 |
|     Defendant. | : | |

**RULING RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 39 & 41)**

I.      **INTRODUCTION**

Plaintiffs R.R. and W.R. ("Parents") bring this action individually and as parents of M.R. ("Student"), a minor student with disabilities (collectively, "the plaintiffs").  See Complaint at ¶ 1 ("Compl.") (Doc. No. 1).  Following this court's grant of defendant Greenwich Board of Education (the "Board")'s partial Motion to Dismiss, see Ruling on Defendant's Motion to Dismiss (Doc. No. 33), the Board now moves for Summary Judgment affirming the Final Decision and Order of the Connecticut Impartial Hearing Officer ("IHO"), Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 1 (Doc. No. 40); see also Defendant's Motion for Summary Judgment ("Def.'s Mot.") (Doc. No. 39); Defendant's Local Rule 56(a)1 Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Def.'s LR 56(a)1 Stmt.") (Doc. No. 52); Memorandum of Law in Opposition to Plaintiff's [sic] Motion for Summary Judgment ("Def.'s Opp."); Defendant's Local Rule 56(a)2 Statement of Facts in Opposition to Plaintiff's [sic] Motion for Summary Judgment ("Def.'s LR 56(a)2 Stmt.") (Doc. No. 55). The IHO's Decision concluded that the Board

had met its obligations under the Individuals with Disabilities Education Act ("IDEA").
Compl., Attach. 1, Final Decision and Order ("IHO Decision") (Doc. No. 1-1).

 The plaintiffs ("the Parents") oppose the Board's Motion to affirm the IHO's
Decision and cross-move for Summary Judgment, asking this court to reverse the IHO's
Decision denying their request for tuition reimbursement for Parents' unilateral
placement of M.R. at Winston Preparatory School ("Winston Prep") for the 2019–20 and
2020–21 academic years.  See Plaintiffs' Memorandum of Law in Support of Plaintiffs'
Motion for Summary Judgment ("Pls.' Mem.") at 6 (Doc. No. 41-1); see also Plaintiffs'
Cross-Motion for Summary Judgment ("Pls.' Mot.") (Doc. No. 41); Plaintiffs' Response
to Defendant's Cross-Motion for Summary Judgment and Memorandum of Law ("Pls.'
Opp.") (Doc. No. 45); Plaintiffs' Reply to Defendant's Memorandum of Law in Opposition
to Plaintiffs' Motion for Summary Judgment ("Pls.' Reply") (Doc. No. 46); Plaintiffs' Local
Rule 56(a)1 Statement of Undisputed Material Facts ("Pls.' LR 56(a)1 Stmt.") (Doc. No.
53); Plaintiffs' Second Amended Local Rule 56(a)2 Response to Defendant's Statement
of Facts in Opposition to Defendant's Motion for Summary Judgment ("Pls.' LR 56(a)2
Stmt.") (Doc. No. 64).

 For the reasons discussed below, the court grants the Board's Motion for
Summary Judgment (Doc. No. 39) and denies the plaintiffs' Cross-Motion for Summary
Judgment (Doc. No. 41).

## II.    FACTUAL BACKGROUND[1]

As of the filing of the plaintiffs' Cross-Motion for Summary Judgment on August 8, 2022, M.R. was in the eleventh grade, aged sixteen, and lived in Greenwich, Connecticut with her parents, R.R. ("Mrs. R.") and W.R.  Def.'s LR 56(a)2 Stmt. ¶ 1.[2] This action, however, concerns events that occurred when M.R. first moved there from New York City, the summer before she began the eighth, and subsequently ninth, grade.  Id. at ¶¶ 5, 24.

M.R.'s parents describe her as "intelligent, creative, loving, sweet, and kind."  Id. at ¶ 7.  M.R. struggles with "Attention Deficit/Hyperactivity Disorder ('ADHD') and Specific Learning Disabilities with impairments in mathematics and reading comprehension."  Id. at ¶ 9.  These struggles were formally diagnosed by Dr. Kornbleuth when M.R. began fifth grade in 2016.  Id.  Additionally, M.R. was also later diagnosed by Dr. Mukherjee in 2018 (hereinafter, "Mukherjee Report") with "Unspecified

---

[1] The court draws primarily from the Plaintiffs' Local Rule 56(a)2 Statement of Facts in Opposition to Defendant's Local Rule 56(a)1 Statement ("Pls.' LR 56(a)2 Stmt.") because it contains both a reproduction of the defendant's Local Rule 56(a)1 Statements as well as the plaintiffs' admission or opposition to those facts.  See Pls.' LR 56(a)2 Stmt.  This is despite the fact that the plaintiffs' responses in their Plaintiffs' Local Rule 56(a)2 Statement are rarely in accordance with the Local Rules.  See, e.g., Pls.' LR 56(a)2 Stmt. ¶ 1 (no citations included in plaintiffs' objection) (defendant stating when the plaintiffs moved to Greenwich, plaintiffs replying "Objection, the date the family 'moved into their Greenwich home for school' is irrelevant to this action.  Greenwich regulations require a family to provide proof of 'residency' when they enroll their children.  M.R. and her older sister enrolled in Greenwich Public schools in mid-August 2019.  At no time has the Board disputed MR's residency and right to a FAPE from Greenwich Board of Education.").  The court also relies, to a lesser extent, on the Defendant's Local Rule 56(a)2 Statement where appropriate.  See also p. 5 n.2, infra.

[2] As with nearly every one of the defendant's Statements of Fact, this Statement was objected to by the plaintiffs.  See p. 3 n.1, supra.  The Board also frequently denied the Parents' Statements of Fact, primarily for the reason that the material cited from the Administrative Record did not support the particular Statement asserted.  See, e.g., Def.'s LR 56(a)2 Stmt. ¶ 22.  Rather than explain every citation to the parties' Statements, the court notes here that, in reviewing each parties' Local Rule 56(a)1 Statements, this court checked the assertions against the record pages to which they were cited.  Where the citation supported the Statement or Response, the court cites to that citation.  This sometimes includes the Local Rule 56(a)2 responses to the other party's Local Rule 56(a)1 statements, see e.g. id. at ¶ 27, and sometimes it means that the court took the common, supported statements from both parties within the same Local Rule 56(a) paragraph, see, e.g., Pls.' LR 56(a)2 Stmt. ¶ 70.

Anxiety Disorder", "Specific Learning Disability with specific impairment in reading: comprehension", and "Specific Learning Disability . . . with specific impairments in written expression: and clarity and organization".  Mukherjee Report, Admin. Record at 45 (Doc. No. 25-6).

M.R. went to elementary school at a public school in New York City until sixth grade, when her Parents placed her in private school.  Def.'s LR 56(a)2 Stmt. ¶ 5; Pls.' LR 56(a)2 Stmt. ¶ 6.  She received an IEP from the New York City public school system for her seventh grade year in September 2018 (hereinafter referred to as the "2018 NYC IEP"), which included the following quotation:

> [M.R.] has been working on coping skills, positive reinforcement, and goal-setting. . . .  M.R.'s tendency to be oppositional and shut down at school and home is often attributable to her difficult with self-regulation and fear of conflict, as well as fixed and rigid thought pattern[s] and belief[s] about herself and the world. . . .  [She also] suffers from significant hand tremors that requires support of a keyboard at times due to fatiguing.  She has difficulty with note taking.  She has difficulty paying attention and taking notes.

Def.'s LR 56(a)2 Stmt. at ¶ 18.  The 2018 NYC IEP also stated that,

> According to Neuropsychological evaluation[, M.R.] has a history of anxiety since early childhood that is ongoing. . . .  [H]er parents are concerned about ongoing regulatory issues that disrupt academic performance and areas of social and emotional functioning.  Specifically, [M.R.] has difficulty with transitions and completing the morning routine in a timely fashion, thus is frequently late to school. . . .  She is sensitive, overly dependent, has trouble sleeping, complains of stomach aches, has a limited friend group and can be hard to discipline.

2018 NYC IEP, Administrative Record at 23 (Doc. No. 25-6).  According to the plaintiffs, this 2018 NYC IEP was never implemented.  Def.'s LR 56(a)1 Stmt. ¶ 22; see also Def.'s Opp. at 16 (emphasis in original) ("[T]he NYC IEP was never implemented, as the Student attended Fusion for her seventh-grade year.").  Instead, they unilaterally placed

M.R. in private schools for sixth and seventh grades, with Fusion Academy as her seventh grade school placement, receiving reimbursement from NYC Public Schools based on a settlement agreement not here relevant.  Def.'s LR 56(a)2 Stmt. ¶ 22.

    A.    <u>Eighth Grade</u>

        1.    June – August 2019

The plaintiffs decided to move to Greenwich, Connecticut before M.R. entered the eighth grade, and they visited its public middle school, Central Middle School ("CMS"), in June 2019 to begin the process.  Def.'s LR 56(a)2 Stmt. ¶ 24.  The Parents were given enrollment forms and instructed to return in August to complete the enrollment process.  R.R. Test., Admin. Record at 1003–04 (Doc. No. 25-8).  When they returned mid-August to submit the registration material for the 2019-2020 school year, Mrs. R. and M.R. met with CMS Guidance Counselor Michele Davis ("Ms. Davis").  Pls.' LR 56(a)2 Stmt. ¶ 22; R.R. Test., Admin Record at 1228.  Mrs. R informed Ms. Davis that M.R. was "very sensitive with high levels of anxiety, so the parties discussed ways to make the transition to CMS easier for Student."  Pls.' LR 56(a)2 Stmt. at ¶ 23.[3]  Mrs. R also provided Ms. Davis copies of the 2018 NYC IEP and the Mukherjee Report.  <u>Id.</u> at ¶ 22; <u>see also</u> R.R. Test., Admin. Record at 1007.

The Mukherjee Report recommended that M.R. be placed in "small . . . structured and supportive classrooms within a small school environment that can offer [M.R.] the frequent, individualized, special education supports for her deficits in reading, writing, and math, as well as learn [sic] organization and planning skills."  Def.'s LR 56(a)2 Stmt. ¶ 17.  The 2018 NYC IEP provided instruction in an "integrated co-teaching classroom

---

[3] <u>See</u> nn.1–2, <u>supra</u>.

setting" and stated that M.R. "would . . . receive pull-out Special Education Teacher Support Services . . . for all core subjects" with weekly counselling.  Id. at ¶ 19.

With these resources in hand, and Mrs. R.'s articulated concerns in mind, "Ms. Davis and the Administrator for Special Education, Lindsey Pontieri, along with special educators and administrators at CMS collaborated to develop Student's initial class schedule", placing M.R. "in a mix of grade level general education classes and skills-based, special education classes for English, math and academic lab."  Pls.' LR 56(a)2 Stmt. ¶ 24 (internal citations to the record omitted);[4] see also Ms. Davis Test., Admin Record at 735 (Doc. No. 25-8).

2.     August 29 – October 29, 2019

The first day at CMS was August 29, 2019, the same day that M.R.'s Parents received notice for a Planning and Placement Team ("PPT") meeting to be held on September 9, 2019, to discuss M.R.'s situation and put together an Individualized Education Program ("IEP").  Def.'s LR 56(a)2 Stmt. ¶ 35.  Shortly prior to the September 9, 2019 PPT meeting and after reviewing a presentation made by M.R. and reconsidering some of her work samples, CMS staff decided to switch M.R. from an "ELA skills class. . . taught by a special education teacher [to] . . . a small group of students with IEPs" to a general education English class that was co-taught "with a para support in [the] class."  Ms. Baumeister Test., Admin. Record at 34–36 (Doc. No. 25-8); see also Pls.' LR 56(a)2 Stmt. ¶ 28.

---

[4] Plaintiffs responded to this Statement with a bare "[o]bjection" without providing any citation, rationale, or contrary facts to support the Objection.  The court deems it admitted.  See D. Conn. L.R. 56(c)3 ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to [the record]. . . . Failure to provide specific citations to evidence in the record . . . may result in the Court deeming admitted certain facts that are supported by the evidence . . . .").

The PPT met for the first time on September 9, 2019, as planned; at that meeting, M.R. was formally "determined eligible for special education, and an IEP for [her] was developed."  Pls.' LR 56(a)2 Stmt. ¶ 30.  The draft IEP's "proposed goals and objectives", based on the 2018 NYC IEP and Dr. Mukherjee's report, were shared with the PPT.  Id.  Mrs. R. provided additional information about M.R., reviewed the proposed IEP, agreed with its goals, and agreed with implementing it immediately.  Id. at ¶ 31.[5]  M.R.'s IEP was adopted and implemented eleven days after the first day of school.

As the semester progressed, however, M.R.'s "attendance and related lack of work completion became an issue", with M.R. "miss[ing] over half of her [morning] counseling sessions because of absences or tardiness".  Id. at ¶ 40.  In fact, M.R.'s attendance was such that she was only at CMS for "thirteen full days[, out of a total 25 days,] between the start of school and October 4, 2022."  Id.; see also Admin. Record at 44 (Doc. No. 25-4).  The Board therefore put together a School Avoidance Plan ("SAP") and "contacted [the plaintiffs] to discuss" it.  Pls.' LR 56(a)2 Stmt. ¶ 43.[6]  The SAP included a "plan for nighttime and morning routines for [the] Parents to implement at home", and a copy was provided to Mrs. R on September 26, 2019, with an invitation for feedback in advance of another PPT meeting before it was formally adopted.  Id.; Healy Test., Admin. Record at 457 (Doc. No. 25-8).

---

[5] Plaintiffs did not respond to this Statement, which was made by the Board and is appropriately supported by its cited material.  The court therefore deems it "admitted".  See D. Conn. L. Civ. R. 56(a)3.

[6] Plaintiffs "[o]bject[ ]" to this Statement not to dispute its accuracy, but to point out that the "9/9/2019 and 10/4/2019 IEPs did not include parent training direct or consult services" and that, as a result, the SAP "shifted virtually all responsibility for helping MR access learning and engage in school on the parents with little to no guidance on how to go about doing that."  Pls.' LR 56(a)2 Stmt. ¶ 43 (Parents' Response).  Because this objection does not establish that the above-quoted sentence is untrue, the court deems the Statement admitted.

On September 26, 2019 "[a]fter two absences and on her eighth tardy day," M.R. came in late "because she was touring a private school, Norwalk Winston Prep [('Winston')]."  Pls.' LR 56(a)2 Stmt. ¶ 47; M.R. Attendance Sheet, Admin. Record at 8 (Doc. No. 25-5).  She was subsequently absent altogether for a "shadow day" at Winston on October 2, 2019.  Pls.' LR 56(a)2 Stmt. ¶ 49.  One member of the PPT testified that M.R. had commented that "her tardiness 'didn't really matter anyway[,]'" and another "reported that [M.R.] 'wasn't completing work because she felt that she wasn't going to be [at CMS] much longer.'"  Id. at ¶ 48.

On October 4, two days after M.R. attended her Winston "shadow day", the PPT "reconvened to review and revise the Greenwich IEP, at which time the school avoidance plan was discussed and adopted", id. at ¶ 50; see also Napolitano Test., Admin. Record at 230 (Doc. No. 25-8), and

> The team further revised the goals and objectives of the IEP to expressly address attendance and academic performance. . . .  The plan called for, among other things, that if the Student is experiencing school avoidance/refusal, the parent will contact CMS to access support resources. . . .  CMS staff will then call home and speak to the Student, providing specific expectations for Student, and if those interventions are not successful, parent would contact 2-1-1 (clinical support services available to CT families) and school staff would make a home visit if there were any prolonged periods of school refusal/avoidance.

Pls.' LR 56(a)2 Stmt. ¶ 53.[7]  CMS staff did in fact attempt to make a home visit on October 16, but the plaintiffs turned it down because they were already on their way to school.  Napolitano Test., Admin. Record at 255–56 (Doc. No. 25-8).

---

[7] Here, plaintiffs again object to the Board's appropriately supported Statement but offer no cited evidence to support their objection.  See also nn.1–2, supra.  The court deems the Board's Statement "admitted".  See D. Conn. L. Civ. R. 56(a)3.

Despite the attempted interventions and accommodations, the plaintiffs gave CMS formal notice on October 11 that they would be unilaterally placing M.R. at Winston later that month.  Pls.' LR 56(a)2 Stmt. ¶ 57.  The "alleged school avoidance issue", however, did not quickly "resolve when the Student began at Winston" and "took until approximately February 2020 to improve."  Id. at ¶ 70.  In fact, "Mrs. R admitted that the Student would sit in the car in the parking lot for thirty to forty minutes while Norwalk Winston Prep staff tried to get her to come into the building."  Id.  Dr. Riordan, a clinical psychologist retained in October 2019 as a prerequisite to enrollment at Winston, "confirmed [at the proceeding before the IHO] that the tardiness issue was caused by '[M.R.'s] perfectionism and getting things ready in the morning . . . preparing her breakfast and her lunch.'"  Id.;[8] id. at ¶ 58.  These were items that CMS's SAP addressed both by providing a structured schedule for M.R. to follow and by specifically allocating time to, inter alia, "[e]at breakfast and get lunch ready" before school.  School Avoidance Plan ("SAP"), Admin. Record at 101–02 (Doc. No. 25-6); see also Pls.' LR 56(a)2 Stmt. ¶ 70.

M.R. stayed at Winston and, "[b]y the end of the 2019-2020 school year", M.R.'s grades were a mix of As and Bs, with a total absence count of six between late October and the end of the 2020 school year.  Def.'s LR 56(a)2 Stmt. ¶ 63.

B.    Ninth Grade

"[C]opies of the Student's Winston Preparatory School's records and report cards were sent to the Board on February 28, 2020."  Pls.' Mem. at 19.  The PPT reconvened on July 21, 2020, to "review or revise" M.R.'s existing IEP in preparation for her freshman year at Greenwich High School.  Def.'s LR 56(a)2 Stmt. ¶ 66.  The plaintiffs

---

[8] The plaintiffs object to one word in this Statement.  The remainder is, therefore, admitted.

received notice of this meeting on July 8, 2020, via email; there was not a new IEP. Admin. Record at 53–54 (Doc. No. 25-3).   The plaintiffs updated the other members of the PPT on M.R.'s progress at Winston and voiced their various concerns about M.R. attending Greenwich High School, such as the school's large size.  Def.'s LR 56(a)2 Stmt. ¶¶ 72–73.

The PPT met again on August 26, 2020, and the plaintiffs reiterated their disagreement with the adequacy of M.R.'s IEP, particularly that "many of the goals and objectives . . . were simply repeated from the prior IEP".  Id. at ¶ 75; see also Admin. Record at 80 (Doc. No. 25-3).  The ninth grade IEP itself focused on "math, writing, reading comprehension, and transition goals", as well as "social emotional goals" which included "coping skills and learning how to access help when needed."  8/26/2020 IEP, Admin. Record at 2 (Doc. No. 25-7).  It did not detail the classes M.R. was to take, see id. at 1–36.  The PPT requested that M.R. participate in placement testing for her classes, but the plaintiffs refused.  Id. at 2; R.R. Test., Admin. Record at 1301–02 (Doc. No. 25-8).

The plaintiffs expressed concerns about the IEP at the August 26, 2020 PPT meeting and requested that the Board place M.R. at Winston Prep.  8/26/2020 IEP, Admin Record at 2.

III.   **PROCEDURAL HISTORY**

On February 20, 2020, the plaintiffs initiated a special education due process hearing with the Connecticut State Department of Education.  IHO Decision at 2.  The plaintiffs' subsequent requests relating to future school years were soon consolidated into a single action.  Id.  The requests asserted an IDEA claim based on the Board's alleged denial of M.R.'s right to a Free Appropriate Public Education ("FAPE") during

the 2019-2020 and 2020-2021 school years.  Id. at 18–21.  Due to the COVID-19

pandemic and an "unprecedented and unanticipated power failure", the proceedings

were delayed and did not commence until September 2020.  Id. at 2.  Following the

hearing and post-hearing briefing from the parties, the IHO issued her Final Decision

and Order on May 12, 2021, denying the claims brought by M.R. through her parents.

Plaintiffs subsequently filed the instant action in this court on June 24, 2021.

The Board moves for Summary Judgment, arguing that it timely "identified the

Student as eligible for special education and timely made available to the Student a

comprehensive program . . . provid[ing] . . . a FAPE . . . , and that the Parents effectively

thwarted the Board's ability to implement that program."  Def.'s Mem. at 16.  The

plaintiffs oppose and cross-move for Summary Judgment reversing the IHO's Decision,

arguing that they should be reimbursed for their "unilateral placement of the Student at

Winston Preparatory School . . . for the 2019-2020 [and] . . . 2020-2021 school year[s]."

Pls.' Mem. at 4.

## IV.   LEGAL STANDARDS

### A.   IDEA Framework

The IDEA is designed, in large part, "to ensure that all children with disabilities

have available to them a free appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare them

for further education, employment, and independent living . . . ."  20 U.S.C.

§ 1400(d)(1)(A).  At the heart of the IDEA is the requirement that public schools provide

a free appropriate public education ("FAPE") to children with disabilities.  See 20 U.S.C.

§ 1412(a)(1)(A) (requiring that state provide "[a] free appropriate public education . . . to

all children with disabilities residing in the [s]tate between the ages of 3 and 21").  The

IDEA contemplates a FAPE that provides "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017).

School districts are subject to a number of substantive and procedural requirements, all focused on providing FAPEs to children with disabilities under the IDEA (hereinafter, "qualified students" or "qualified children").  Most notably, to ensure that qualified students receive a FAPE, school districts must develop individualized education programs for each qualified student.  See generally 20 U.S.C. § 1414(d).  An individualized education program ("IEP") is a written statement that sets forth (1) annual goals for the qualified child, see 20 U.S.C. § 1414(d)(1)(A)(i)(II); (2) the way in which progress towards those goals will be measured and reported, see 20 U.S.C. § 1414(d)(1)(A)(i)(III); and (3) a description of the services that will be provided to help the qualified student achieve these goals, see 20 U.S.C.§ 1414(d)(1)(A)(i)(IV).  IEPs must be reviewed periodically, but no less often than once per year, to determine whether the student is achieving the annual goals set out in the IEP.  See 20 U.S.C. § 1414(d)(4)(A).  Further, IEPs must be revised to address, inter alia, "any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate . . . ."  Id.

In reviewing the adequacy of an IEP, the "question is whether the IEP is reasonable, not whether the court regards it as ideal."  Endrew F., 137 S. Ct. at 999 (emphasis in original).  As noted above, a FAPE must provide "an educational program reasonably calculated to enable a child to make progress appropriate in light of the

child's circumstances."  Id.  The "IDEA does not require a school district to furnish 'every special service necessary to maximize each handicapped child's potential.'"  D.B. v. Ithaca City Sch. Dist., 690 Fed. App'x 778, 783 (2d Cir. 2017) (summary order) (quoting Board of Educ. v. Rowley, 458 U.S. 176, 199 (1982)).  Indeed, the Second Circuit has noted that qualified students are entitled only to an "appropriate education, not one that provides everything that might be thought desirable by loving parents."  Bryant v. N.Y.S. Educ. Dep't, 692 F.3d 202, 215 (2d Cir. 2012) (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 132 (2d Cir. 1998)).

In a circumstance where a qualified child has previously received special education services from a school district and parents enroll that child in a private school without the district's consent, "a court or a hearing officer may require the [school district] to reimburse the parents for the cost of that enrollment . . . ."  20 U.S.C. § 1412(a)(10)(C)(ii).  The parents may only be reimbursed for such "unilateral placement" —where, as here, parents enroll their child in private school without the district's consent— if the court or hearing officer finds that (1) the district has not provided a FAPE in a timely manner, prior to enrollment in the private school, id., and (2) the private placement itself was appropriate, and (3) "equitable considerations favor reimbursement", A.N. v. Bd. of Educ. for Iroquois Cent. Sch. Dist., 801 F. App'x 35, 36 (2d Cir. 2020) (citing E.M. v. New York City Dep't of Educ., 758 F.3d 442, 451–52 (2d Cir. 2014)).  The court does not proceed to the second and third questions, however, if the parents fail to establish that the district failed to provide a timely FAPE.  M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000) (internal citation omitted).

B.    Motion for Summary Judgment in IDEA Cases: Standard of Review

As a matter of practice, "IDEA appeals are generally resolved in full via cross-motions for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure."  A. v. Greenwich Bd. of Educ., No. 3:15-CV-00203 (CSH), 2016 WL 3951052, at *8 (D. Conn. July 2, 2016).  However, though "the parties in an IDEA action may call the procedure a motion for summary judgment, the procedure is in substance an appeal from an administrative determination not a summary judgment motion." Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005); see also M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012).  "[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact."  Lillbask, 397 F.3d at 83 n.3.  Instead, the motion "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  Id.  The court must "grant such relief as [it] determines is appropriate," based on a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C)(iii).

The IDEA sets up a system in which the "responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers," whose rulings are "then subject to 'independent' judicial review."  Walczak, 142 F.3d at 129.  "[D]istrict court[s] must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," but "the Supreme Court has cautioned that such review is by no means an invitation to the courts to substitute their

own notions of sound educational policy for those of the school authorities which they review." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191–92 (2d Cir. 2005) (quotation marks and citations omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206, 208). "[O]nce a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States." Rowley, 458 U.S. at 208.

In M.H. v. New York City Department of Education, (2d Cir. 2012), the Second Circuit rejected the invitation to create a bright-line rule as to the measure of deference to be afforded different types of determinations by the hearing officer, see 685 F.3d at 243–44, and instead set forth a more holistic framework:

> In many determinations made by administrative officers, the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role. As the Supreme Court made clear in [Board of Education of Hendrick Hudson Central School District, Westchester County v.] Rowley, [458 U.S. 176 (1982),] the purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in educating their residents. In policing the states' adjudication of IDEA matters, the courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding.
>
> By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.

> Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the [hearing officer] than when the district court has before it additional evidence that was not considered by the state agency.

685 F.3d at 244 (internal citations omitted).  In evaluating challenges to different aspects of a hearing officer's decision, the court must evaluate each conclusion in turn to determine how much deference it is due.

## V.   DISCUSSION

In their Motion for Summary Judgment, the plaintiffs ask this court to reverse the IHO's Decision denying tuition reimbursement for M.R.'s unilateral placement at Winston for the 2019–2020 and 2020–2021 academic years.

### A.   2019–20 FAPE

The plaintiffs argue that the Board denied M.R. a FAPE in her 8th grade year in two ways: by (1) committing procedural violations that rose to the level of a substantive denial of a FAPE; and (2) "belatedly offer[ing]" M.R. an IEP that was "not appropriate and was not reasonably calculated to provide [M.R.] educational benefit."  Pls.' Mem. at 2.

#### 1.   Procedural Violations

The plaintiffs allege that the "IHO failed and refused to hold the Defendant to its legal obligation to M.R. to have an IEP in place for the first day of school."  Pls.' Mem. at 8.  In support of this contention, the plaintiffs cite the Code of Federal Regulations section 300.323(a), which instructs that, "[a]t the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction,

16

231c4eb4117c9f7e

an IEP[.]"  Pls.' Mem. at 9; 34 C.F.R. § 300.323(a).  The Board counters that the parallel

statutory provision, title 20 of the United States Code, section 1414(d)(2)(A), "expressly

applies only as to 'each child with a disability in the agency's jurisdiction.'"  Def.'s Opp.

at 2 (quoting 20 U.S.C. § 1414(d)(2)(A)).  The Board contends that it "had not yet

identified M.R. as a 'child with a disability' within the meaning of" the IDEA by the first

day of classes—and "until the Board determined that M.R. was eligible pursuant to

Connecticut law, M.R. was not a 'child with a disability' within the [Board]'s jurisdiction

. . . ."  Id. (citing 20 U.S.C. § 1414(a)(1)(A)).  The court agrees with the Board that there

was no procedural violation.[9]

    A "child with a disability" is defined under the IDEA as "a child who suffers from a

qualifying disability and 'who, by reason thereof, needs special education and related

services.'"  A.P. ex rel. Powers v. Woodstock Bd. of Educ., 572 F. Supp. 2d 221, 225

(D. Conn. 2008), aff'd sub nom. A.P. v. Woodstock Bd. of Educ., 370 F. App'x 202 (2d

Cir. 2010) (quoting 20 U.S.C. § 1401(3)(A)).  Critically, then, "the fact that a child may

have a qualifying disability does not necessarily make him 'a child with a disability'

eligible for special education services under the IDEA. . . .  The child must also need

special education and related services."  Id. (citing Alvin Indep. Sch. Dist. v. A.D., 503

F.3d 378, 383 (5th Cir.2007)).

    When M.R. enrolled at CMS, the Board had received her IEP developed by New

York City for the prior year and a neuropsychologist's report for the same year by mid-

---

[9] It bears noting that not all procedural error renders an IEP inadequate.  Grim v. Rhinebeck Cent.
Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).  Under the IDEA, procedural violations only rise to the level
of denying a child a FAPE where they either "impeded the child's right to a [FAPE]," (2) "significantly
impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a
[FAPE] to the parents' child, or (3) caused a deprivation of educational benefits[.]"  L. ex rel. Mr. F. v. N.
Haven Bd. of Educ., 624 F. Supp. 2d 163, 178–79 (D. Conn. 2009) (internal quotation marks omitted)
(citing 20 U.S.C. § 1415(f)(3)(E)(ii)(I)–(III)).

August 2019, Admin. Record at 1003–04, which indicated that she has some

disabilities.  However, at that time, the Board had yet to make a determination that M.R.

was in need of special education in Greenwich, Connecticut.  Indeed, the IDEA instructs

state educational agencies to "conduct a full and individual initial evaluation . . . before

the initial provision of special education and related services to a child with a disability

under this [Act]."  20 U.S.C. § 1414(a)(1)(A); see also 34 C.F.R. §§ 300.301, 300.304–

306 (describing minimum requirements for initial evaluation procedures to be followed

by public agencies).  Connecticut's corresponding statute describes this initial

evaluation as required of Connecticut public agencies and provides that the PPT,

> as part of an initial evaluation, if appropriate, . . . shall review existing evaluation data on the child, including evaluations and information provided by the parent or guardian or the child, classroom-based assessments and observations and teacher and related services provider observations. On the basis of such review, and input from the child's parent or guardian, the planning and placement team shall identify what additional data, if any, is needed to determine:
>
> (A) Whether the child has a particular category of disability, . . . ;
>
> (B) the present levels of performance and educational needs of the child;
>
> (C) whether the child needs special education and related services, . . . or whether the child is able to be served within the regular education program with existing supplemental services, available in the school district; and
>
> (D) whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the individualized education program of the child and to participate, as appropriate, in the general curriculum.

Conn. Gen. Stat. § 10-76ff(b)(1).

The IDEA and the federal regulations promulgated thereunder have no separate

timing requirements for a student who transfers schools between states, in between

school years.  See generally 34 C.F.R. § 300.323 (requiring an IEP in effect "at the

beginning" of the school year).  It instead simply provides that, once a determination has

been made that a child "needs special education and related services", a "meeting to develop an IEP" must be "conducted within 30 days".  Id.  There is no procedural violation where the Board, in the instant case, provided M.R. with an IEP the same day it determined that she was in need of special education.

Nor does the fact that this September 9, 2019 PPT meeting occurred six school days after the start of the school year alter this court's conclusion.  Federal regulations require that "[e]ach public agency must conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability" under the IDEA.  34 C.F.R. § 300.301.  "If the State establishes a timeframe within which the evaluation must be conducted, [the initial evaluation must be conducted] within that timeframe[.]"  Id.

Connecticut state regulations provide for a system in which disabled children are identified through a referral process, whereby a student is referred for an initial evaluation to determine her eligibility for special services.  Referrals can come from "appropriate school personnel, as well as from a child's parents, or from a physician, clinic or social worker, provided the parent so permits."  Conn. Agencies Regs. § 10-76d-7.

In this instance, the source of M.R.'s referral was her Parents, who notified the Board of M.R.'s disability by at least mid-August when they submitted the enrollment forms for CMS.  And while the Connecticut regulations provide that "[w]ritten notice" of an impending PPT meeting "shall be sent to the parents no later than five days after the date of referral", Conn. Agencies Regs. § 10-76d-8, the date of referral in this case is, by regulation, M.R.'s first day of school, see Conn. Agencies Regs. § 10-76d-13 ("In the

case of a referral made in between school years, the effective date of the referral may be deemed to be the first school day of the next school year.").  The Board's notice to the Parents was provided on M.R.'s first day of school and therefore satisfied the regulatory five-day period.

Connecticut regulations further provide that the IEP must be implemented "within forty-five days of referral or notice, exclusive of the time required to obtain parental consent."  Conn. Agencies Regs. § 10-76d-13.  In the instant case, notice was provided on the same day as the referral, Def.'s LR 56(a)2 Stmt. ¶ 35, and the IEP was implemented eleven days later,  Pls.' LR 56(a)2 Stmt. ¶ 31, well within the forty-five day period.  See generally Section II.A.2, supra.  The court therefore agrees with the Board that the IHO correctly determined no procedural violation occurred with respect to the development and implementation of M.R.'s IEP for her eighth grade year, 2019-2020.

2.     Substantive Adequacy of IEP

The plaintiffs ask this court to reverse the IHO's determination that the 2019-2020 IEP was substantively adequate for M.R.'s needs.  See Pls.' Mem. at 2.  The IHO found that the IEP would have provided M.R. with a FAPE and additionally noted that:

> [T]he Parents made the decision for unilateral placement without giving the Board a reasonable chance to implement its plan for the Student.  It is unreasonable to expect that significant or measurable progress would have been made, and documented, in a mere 13 school days . . . . Without allowing a reasonable amount of time for CMS to effectuate its plan, or even to gather enough data to evaluate whether the plan was working, the Parents effectively thwarted the Board's ability to do the job it was mandated to do.

IHO Decision at 21.

The Second Circuit has cautioned that, "[a]lthough the district court must engage in an independent review of the administrative record and make a determination based

on a 'preponderance of the evidence,' . . . such review is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." <u>Cerra</u>, 427 F.3d at 191–92 (internal citation and quotation omitted). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." <u>Grim</u>, 346 F.3d at 382. Thus, "[i]n order to avoid impermissibly meddling in state educational methodology," the Second Circuit has directed courts to determine the substantive adequacy of an IEP by "examin[ing] the record for any objective evidence indicating whether the child was likely to make progress or regress under the proposed plan." <u>Cerra</u>, 427 F.3d at 195 (internal quotations and citations omitted).

The court concludes that the IHO's determination that the Board's 2019-2020 IEP was likely to help M.R. progress is supported by a preponderance of the evidence. M.R.'s 2018 IEP and the Mukherjee Report suggested M.R. was weak in mathematics and English. Def.'s LR 56(a)2 Stmt. ¶¶ 17, 19. In light of that, the Board initially placed M.R. in "skills-based, special education classes for English, math and academic lab." Pls.' LR 56(a)2 Stmt. ¶ 24 (internal citations to the record omitted).[10] When M.R. illustrated strength in writing, she was moved, Ms. Baumeister Test., Admin. Record at 34–36 (Doc. No. 25-8); <u>see</u> Pls.' LR 56(a)2 Stmt. ¶ 28, and the following 2019-2020 IEP reflected a placement for her "in the least restrictive environment with her nondisabled peers in English, science and social studies[,]" Def.'s Mem. at 28; <u>see</u> 9/9/2019 IEP,

_____

[10] Again, plaintiffs responded to this Statement by the Board with a bare "[o]bjection" without providing any citations or contrary facts to support the Objection. The court deems it admitted. <u>See</u> D. Conn. L.R. 56(c)3.

Admin. Record at 2, 5, 12 (Doc. No. 25-6).  The decision to place M.R. in the general English class was further supported when M.R. "performed in the average-to above-average range in the area of reading and writing" in her October 2019 evaluation.  Def.'s Mem. at 28 (citing Admin. Record at 109 (Doc. No. 25-5) (results from M.R.'s October 2019 evaluation, completed in advance of M.R.'s attendance at Winston Prep)).

When M.R.'s tardiness and absences became an issue interfering with the IEP's effectiveness, the PPT met again and provided a set plan to encourage and ensure M.R.'s punctual attendance.  A preponderance of the evidence shows that the reason why the SAP and IEP's effectiveness was not reflected in M.R.'s grades before she went to Winston Prep was because M.R. believed she would be leaving CMS.  The record likewise shows that Winston used a strategy similar to that designed by CMS— over the course of months—to get M.R. to overcome similar attendance issues at Winston Prep.  See Pls.' LR 56(a)2 Stmt. ¶ 70.

The court therefore holds that the IHO's conclusion 2019-2020 IEP was likely to help M.R. progress, not regress, was supported by a preponderance of the evidence. The IHO reasonably held that this would have been borne out had M.R. remained at CMS and committed to the 2019-2020 IEP.  The Board's Motion for Summary Judgment (Doc. No. 39) with respect to the 2019-2020 IEP is granted, and the Parents' Cross-Motion (Doc. No. 41) is denied.

B.   2020–21 FAPE

The plaintiffs argue that M.R. was also denied a FAPE for her 9th grade year (2020-2021 school year) and, as such, they contend that the Board should reimburse that year's Winston Prep tuition.  Pls.' Mem. at 3, 30.  The court disagrees.

22

1.      Procedural Violations

The plaintiffs disagree with the IHO's conclusion that there was no procedural violation in the Board's failure to provide a new IEP in advance of the July 21, 2020 PPT meeting.  See Pls.' Mem. at 18–19; IHO Decision at 19.  The IHO determined that the July 21, 2020 PPT meeting was a "bridging" meeting, IHO Decision ¶ 194, and that the Board had no obligation to give the plaintiffs a copy of a new draft IEP because, at that point, there was nothing to provide:

> [June 21, 2020] meeting was limited to a "review and revise" of the current IEP in place for special education students who will be moving into high school, because the classes and services are substantially different in high school.  There was no testimony presented that any new written information was discussed at this meeting.  Therefore, I find that all sufficient specific data was already available to the Parents, who were represented by counsel, at the time of the July 1, 2020 PPT.

IHO Decision at 19.  There is more than sufficient evidence to support the IHO in this conclusion.

Not only was there no new written information discussed at the meeting, as reflected in the meeting notes, see July 21, 2020 Meeting Notes, Admin. Record at 76–77 (Doc. No. 25-6), but there is nothing in the record to suggest that the Parents were unable to meaningfully contribute to the meeting as a result.  In fact, Mrs. R. attended and provided information to the PPT about M.R.'s needs and her performance at Winston Prep.  Id.  As the IHO explained, there is no "statutory provision or regulation requiring that an IEP be produced at the time parents demand.  Instead, school districts must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy."  IHO Decision at 19 (internal quotation marks omitted) (citing Cerra, 427 F.3d at 193).  There was no procedural violation here.

Moreover, for a procedural violation to constitute a denial of FAPE, it must, inter alia, "significantly impede" the parents' ability to contribute to the discussion ensuring their child's FAPE.  20 U.S.C. § 1415(f)(3)(E)(ii)(II).  The plaintiffs do not argue that their ability to contribute was significantly impeded, and the record clearly supports the IHO's finding that the Parents participated fully.

The court therefore agrees with the Board that there was no procedural violation in the creation of the 2020-2021 IEP, much less one that rose to the level of denying M.R. a FAPE for that year.

2.      Substantive Adequacy of IEP

The plaintiffs argue that the IHO erred in finding that the 2020-2021 IEP would have provided M.R. with a FAPE.  See Pls.' Reply at 6.  The court does not agree and concludes that the IHO's finding is supported by a preponderance of the evidence.

In determining whether a school has fulfilled its obligation under the IDEA, the court's analysis turns on "whether the IEP is reasonable, not whether the court regards it as ideal."  Endrew F., 580 U.S. at 399 (emphasis in original).  A flaw in the plaintiffs' argument is that it claims the August 26, 2020 IEP is substantively deficient solely by comparing its provisions to what Winston Preparatory promised for the same period. For example, the plaintiffs point out:

> The Board's IEP contained 4.97 hours of special education instruction per week with pullout services into a resource room with no direct instruction in the Student's general education classes, only accommodations . . . whereas Winston Preparatory was offering the Student 6.50 hours per day of special education instruction without any pull-out services or the need for accommodations.

Pls.' Mem. at 27 (emphasis in original).  Qualifying students are entitled only to an "appropriate education, not one that provides everything that might be thought desirable

24

by loving parents." Bryant v. N.Y.S. Educ. Dep't, 692 F.3d 202, 215 (2d Cir. 2012)

(quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 132 (2d Cir. 1998)).

Comparing the IEP against the Winston program does nothing to further the plaintiffs'

claim that the Board failed to offer M.R. a FAPE for the 2020–2021 academic year or

that the IHO erred by reaching the opposite conclusion.  See M.C. ex rel. Mrs. C., 226

F.3d at 66 (explaining that a court should only consider the private placement's

adequacy after it determines that the public school failed to provide a FAPE).

On the other hand, the Board has pointed to evidence supporting the IHO's

finding, by a preponderance of the evidence, that the 2020-2021 IEP would have

provided M.R. with a FAPE.  For one thing, the PPT recommended, as an additional

accommodation, for teachers to preview, predict and activate M.R.'s background

knowledge so as to support her comprehension of material.  2020-2021 IEP, Admin.

Record at 24 (Doc. No. 25-7).  This satisfies Dr. Riordan's observation that "[p]reviewing

will enable [M.R] to process information faster.  Therefore, she can be provided with an

outline when available prior to class."  Dr. Riordan's Report, Admin. Record at 103 (Doc.

No. 25-5).  The PPT further contemplated that M.R.'s schedule, and specific classes,

was to be informed by Greenwich High School's placement tests.  8/26/2020 IEP,

Admin. Record at 2 (Doc. No. 25-7); Patti Test., Admin. Record at 986–87 (Doc. No. 25-

8).  The parents, however, never had M.R. take the tests.  IHO Decision ¶ 202; R.R.

Test., Admin. Record at 1301–02 (Doc. No. 25-8).

The court finds, by a preponderance of the evidence, that the 2020-2021 IEP

would have provided M.R. with a FAPE likely to lead to progress, not regress.  The

court, therefore, grants the Board's Motion for Summary Judgment (Doc. No. 39), and it denies the Parents' Cross-Motion (Doc. No. 41) as to the 2020-2021 IEP.

## VI.    CONCLUSION[11]

For the foregoing reasons, the court grants the Board's Motion for Summary Judgment (Doc. No. 39), and it denies the plaintiffs' Cross-Motion for Summary Judgment (Doc. No. 41).


**SO ORDERED.**

Dated at New Haven, Connecticut this 30th day of May 2023.


       /s/ Janet C. Hall
       Janet C. Hall
       United States District Judge

---

[11] Because the court may "proceed to the second question" - - of whether parents' private placement of their child was appropriate - - "[o]nly if [the] court determines that a challenged IEP was inadequate", M.C. ex rel. Mrs. C., 226 F.3d at 66, the court does not reach that issue here.